**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-226-CRC** |
| **CHRISTOPHER PATRICK MOYNIHAN,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. The government requests that this Court sentence Christopher Patrick Moynihan to 37 months' incarceration, the middle of the applicable Sentencing Guidelines range; three years of supervised release; $2,000 in restitution; and the mandatory $205 special assessment.

## I.     INTRODUCTION

Moynihan participated in the January 6, 2021 Capitol Breach, a violent attack on the United States Capitol that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.8 million dollars' in losses.[1]

Moynihan was among the first rioters to enter the Capitol Grounds by breaching police barricades on the East Front. When rioters pushed through the police line at the base of the steps,

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Moynihan climbed the steps and joined the rioters outside the Rotunda Door. Moynihan watched as rioters attacked police trying to defend the door, and continued pushing his way forward. When he got to the front of the rioters, he took advantage of a break in the police line to enter the Capitol through the Rotunda Door, saying, "And we're f*cking in!" Once inside, Moynihan marched directly to the Senate Chamber, chanting and shouting as he walked through the halls of the Capitol. After briefly entering the Senate gallery, Moynihan went down a level and entered the Senate Chamber itself. While inside, Moynihan rifled through a notebook on top of a Senator's desk, saying "There's gotta be something in here we can f*cking use against these scumbags." Moynihan also occupied the dais of the Senate, joining other rioters in shouts and chanting. Moynihan did not leave the Senate Chamber until he was forced out by police.

The government recommends that the Court sentence Moynihan to 46 months' incarceration, which is the middle of the applicable 33 to 41 month range. A 37-month sentence acknowledges his admission of guilt, but also reflects the gravity of Moynihan's conduct, his criminal history, and the need to deter Moynihan and others from similar conduct.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  The January 6, 2021, Attack on the Capitol

The government refers to the court to the stipulated Statement of Offense filed in this case, ECF 43, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### *Breach of the Capitol Building on the East Front and the Rotunda Door*

One of the main points of entry for rioters on January 6, 2021 was through a set of ornate

2

double doors at the top of the Central East Steps.   These doors have been referred to as the Columbus Door or the Rotunda Door. The Rotunda Door is often regarded as the main door into the Capitol Building. In Images 1 and 2 below, the Rotunda Doors are circled in red.



*Image 1 – Screenshot from* [*https://youtu.be/CqBB3Mt06XA*](https://youtu.be/CqBB3Mt06XA)

On January 6, 2021, the outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]" These fences were not actively manned, but members of the USCP were stationed nearby as well as patrolling through the grounds. In Image 2, the barricades on the East Front are indicated with dotted lines.



*Image 2: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.*

On the afternoon of January 6, a crowd gathered on the East Front, outside the perimeter. At about 1:58 p.m., individuals in the northeast corner began to tear down the barricades and move into the East Plaza.



*Image 3: Screenshot from https://youtu.be/z1gODZvbhqs*

Shortly thereafter, rioters began pushing against police and tearing down barriers throughout the perimeter.

4



*Image 4: Screenshot from Capitol Security Video*

The rioters pressed forward, through the East Plaza.



*Image 5: Screenshot from https://youtu.be/185f3LPxUYU*

The USCP established a temporary police line at the base of the East Central steps, but were soon overrun. At about 2:06 p.m., rioters flooded up the steps, between the columns, and on to the surrounding balconies.



*Image 6: Screenshot from Capitol Security Video*

The USCP officers retreated to the Rotunda Doors, and were surrounded. Rioters attacked them with sticks, fists, flag poles, and tear gas before they escaped the area.



*Images 8 and 9: Screenshots from https://youtu.be/MVullQb-Lec*

Rioters outside the Rotunda Door attacked the police and tried to break in, smashing the windows in the process. At about 2:25 p.m., a rioter already inside the Capitol opened the door from the inside. Rioters rushed through the door, as others tried to jam a flag through the door to keep it open.  Other members of the exterior crowd assaulted officers who stood with their backs to the Rotunda Door, defending it.



*Images 10 and 11: Screenshots from Capitol Security Video*

Rioters fought officers to keep the door open, pushing and pulling them out of the way, trying to jam their bodies in the doorframe. Officers succeeded in closing the door at approximately 2:28 p.m., after one officer hurled himself through the door and turned his back to the crowd, pushing them back just enough to allow space for the door to close.



*Image 12: Screenshot from Capitol Security Video*

While officers stood guard at the doors, and then barricaded the door with benches, tensions remained high. Rioters outside continued yelling and chanting and skirmishing with officers, trying to breach the doors again. At about 2:37 p.m., rioters from the Rotunda moved towards the doors in an effort to open them, while USCP officers rushed to guard the doors from the inside.



*Image 13: Screenshot from Capitol Security Video*

At about 2:39 p.m., the rioters pushed forward, crushing the police, and forcing the doors open again.



*Image 14: Screenshot from Capitol Security Video*

Once the doors had been breached, and as a security alarm blared, hundreds of rioters poured into the building and past overwhelmed USCP officers, who were pinned against the door.

8


*Image 15: Screenshot from Capitol Security Video*

Rioters continued to push through the Rotunda Door for another hour, battling with police over control of the doors. A combined force of USCP and MPD officers were finally able to secure the Rotunda Doors at around 3:30 p.m.


*Image 16: Screenshot from Capitol Security Video*

**B.  Moynihan's Role in the January 6, 2021, Attack on the Capitol**

Moynihan travelled from his home in New York to Washington, D.C. by car. By 12:53 p.m., Moynihan was east of the Capitol, taking video with his cellphone. *See* Exhibit 1. Moynihan saw the metal barricades which defined a perimeter around the Capitol, and the police protecting the Capitol. *See* Exhibit 2.

9



*Exhibit 2 at :12*

Moynihan was at the Northeast corner of the Capitol when the rioters in that area breached the perimeter. Moynihan was one of the first rioters to go through the fallen barricades and enter the East Plaza. Moynihan ran to the base of the East Central steps, chanting "USA!" "F*ck communism!" and "We want Trump!" *See* Exhibit 3.



*Exhibit 3 at :01*

At the base of the steps, Moynihan worked his way through the crowd of rioters, continuing to

record the scene with his cellphone, and briefly turning the camera on himself as he chanted.



*Exhibit 3 at 2:37*

As he stood at the base of the steps, Moynihan saw the rioters confronting the police line and continued his chanting. *See* Exhibit 4.



*Exhibit 4 at :03*

Moynihan was still recording when the rioters broke through the police line at the base of the steps and surged forward, towards the Rotunda Door. Moynihan pushed forward as well, one

11

of the first rioters to reach the top of the steps. Once atop the steps, Moynihan continued to push

towards the doors, chanting "We Want Trump." *See* Exhibit 5. Moynihan remained outside the

Rotunda Door for the next 35 minutes, watching as rioters attacked the police with sticks, flagpoles

and pepper spray. *See* Exhibit 6 at 8:02, 11:14, 17:05.



*Exhibit 6 at 8:02, 11:14, 17:05*

At about 2:39 p.m. the Rotunda Door opened when rioters on the inside pushed police into

the Door. During the resulting rush, Moynihan pushed his way into the building, to the sounds of

a piercing alarm. *See* Exhibit 7; Exhibit 8.



*Exhibit 7 at :23*



*Exhibit 8 at :31*

As soon as he entered, Moynihan celebrated, shouting "And we're f*cking in!" *See* Exhibit

9. Moynihan proceeded up a nearby staircase, encouraging his fellow rioters with shouts of "F*ck,

yeah. Every single one of you is a patriot! Remember that. Restore this republic. Down with

Communism. Down with Communism. Down with Biden. We will restore our republic." As he

reached the top of the stairs, Moynihan began chanting "Treason." *See* Ex. 9.

13

Moynihan continued down a Senate hallway, past a number of Senate offices, still angrily shouting. *See* Exhibit 10.[2]



*Exhibit 10 at :30*

Moynihan emerged from the hallway to the lobby outside the Senate Gallery. At about 2:45 p.m., Moynihan entered the Senate Gallery, still recording video with his cellphone. He saw that many of the rioters around him wore tactical gear, and one carried zip ties. *See* Exhibit 11.

---

[2] Terrified Congressional staffers, who hid under desks and barricaded doors while the mob attacked, later reported the trauma they experienced. *See* https://rollcall.com/2021/01/28/insurrection-aftermath-staffers-struggle-with-trauma-guilt-and-fear/.



*Exhibit 11 at :11*

Moynihan exited the Gallery and joined other rioters down a nearby staircase leading to one of the entrances to the Senate Chamber. About 2:49 p.m., Moynihan entered the Senate Chamber, and recorded another celebratory video, proudly boasting, "Well guys, I f*cking did it! Stormed the f*cking Senate building! I'm standing inside it right now!" *See* Exhibit 12.



*Exhibit 12 at :01*

Moynihan talked to other rioters in the Chamber, including the rioter brandishing zip ties.



*Screenshot from Senate video*

Moynihan next went to one of the Senator's desks and began rifling through papers, showing them to other rioters.



*Screenshot from Senate Video*

The documents Moynihan rifled through were confidential and related to the certification of the

electoral college vote. *See* Exhibit 13.



*Screenshots from Exhibit 13 at :00, :03*

As Moynihan flipped through the papers, another rioter, referring to the evacuation of the

Senators minutes earlier, noted that the senator to whom the papers belonged "left here in a

hurry." Ex. 13 at :03 - :05.

Moynihan continued to search through the papers, growing frustrated, and saying "[t]here's gotta be something in here we can f*cking use against these scumbags." *See* Ex 13 at :11 - :15; Exhibit 14.



*Ex. 14 at :18*



*Exhibit 14 at :47*

As he reviewed the documents, Moynihan said, "This is Cruz's sh*t. This is a good one. Him and Lawler, or whatever. Hawley, Cruz." Ex. 13 at :24 - :46; Ex. 14 at  :30 - :51. Another rioter said, "I think Cruz would want us to do this." Moynihan responded, "Yeah. Absolutely." Ex. 14 at :53 - :54.



*Exhibit 14 at :51*

Moynihan left the Chamber for a few minutes, re-entering at around 3:04 p.m. As he re-entered, Moynihan noticed Jacob Chansley, the so-called "QAnon Shaman," standing at the Senate dais in the center of the room. Moynihan was visibly amused.



*Screenshot from Senate video*

Moynihan walked to the dais and stood, looking out at the Senate Chamber, as rioters yelled and shouted.

19





*Screenshots from Senate video*

At the end of a "prayer" shouted into a megaphone by Chansley, Moynihan cheered in support and raised his fist in triumph.



*Screenshot from Senate video*

Moynihan remained until about 3:08 p.m., leaving only when law enforcement officers entered the

Senate Chamber to clear out the rioters. Moynihan exited the building through the Senate Carriage

Door at about 3:10 p.m., having been inside the building for a half-hour.



*Screenshot from body-worn camera*

On February 25, 2021, Moynihan was arrested. At the time of his arrest, Moynihan was

asked for the cellphone he carried with him in the Senate Chamber. Moynihan said he no longer

had the phone because he couldn't afford it. That was a lie. Law enforcement obtained a search

warrant for the phone's location and determined it was at his home. They obtained an additional

search warrant for the phone and seized it. On the phone was evidence of Moynihan's and other's criminal conduct on January 6.

### III.    THE CHARGES AND PLEA AGREEMENT

On March 17, 2021, Moynihan was charged by Indictment with Obstruction of an Official Proceeding, in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count One); Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1) (Count Two); Disorderly and Disruptive Conduct in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(2) (Count Three); Entering and Remaining on the Floor of Congress, in violation of 40 U.S.C. § 5104(e)(2)(A) (Count Four); Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Five); and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Six) (DE 9).

On August 23, 2022, Moynihan was convicted of Count One after a trial on stipulated facts, and pled guilty to Counts Two through Six of the Indictment.[3]

### IV.    STATUTORY PENALTIES

Moynihan now faces sentencing on all six counts. As noted by the U.S. Probation Office, the statutory maximum term of imprisonment is 20 years on Count One (Obstruction of an Official Proceeding); one year each on Count Two (Entering and Remaining in a Restricted Building or Grounds) and Count Three (Disorderly and Disruptive Conduct in a Restricted Building or Grounds); and six months each on Count Four (Entering and Remaining on the Floor of Congress), Count Five (Disorderly Conduct in a Capitol Building) and Count Six (Parading, Demonstrating, or Picketing in a Capitol Building). PSI ¶¶75-77.

---

[3] The PSI incorrectly states that Moynihan pled guilty to Count One. *See* PSI ¶ 3.

The maximum terms of supervised release are three years for Count One; and one year for Counts Two and Three. PSI ¶¶ 81-82. The maximum fines for Count One is $250,000, for Counts Two and Three is $100,000, and for Counts Four through Six is $5,000. PSI ¶¶ 99-101. Mandatory special assessments total $205. *Id*.

## V.      THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

While the government agrees with the sentencing range calculated by the Probation Office, the PSI does not include a Guidelines analysis for each of the counts to which the defendant pleaded guilty. *See* PSI ¶¶ 24-42. Sections 1B1.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3. The PSI does not follow these steps. It concludes (*see* PSI ¶ 31) that Counts One, Two and Three group—a conclusion with which the government agrees—but does not set forth the Guidelines calculation separated for each count as required under U.S.S.G. § 1B1.1(a)(4). That Guidelines analysis follows:

**Count One: 18 U.S.C. § 1512(c)(2) § 2—obstructed and aided and abetted the obstruction of an official proceeding before Congress**

| Base offense level: | 14 | U.S.S.G. §2J1.2(a) |
|---|---|---|

| Special offense characteristic | +3 | U.S.S.G. §2J1.2(b)(2): "the offense resulted in substantial interference with the administration of justice." The official proceeding of Congress's Joint Session, which was required by the Constitution and federal statute, had to be halted while legislators were physically evacuated for their own safety. |
|---|---|---|
| Total | 17 | |

**Count Two: 18 U.S.C. § 1752(a)(1)—entering and remaining in a restricted area**

| Base Offense Level: | 4 | U.S.S.G. §2B2.3(a) |
|---|---|---|
| Special offense characteristic | +2 | U.S.S.G. §2B2.3(b)(1)(A)(vii): the trespass occurred "at any restricted building or grounds." On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B). |
| Cross Reference | | U.S.S.G. §2B2.3(c)(1): "If the offense was committed with the intent to commit a felony offense, apply §2X1.1 in respect to that felony offense, if the resulting offense level is greater than that determined above." |
| Base Offense Level (adjusted) | 17 (from Count One) | U.S.S.G. §2X1.1(a): "The base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty."<br><br>Moynihan entered the restricted area of the Capitol complex for the purpose of obstructing the official proceeding—that is, stopping Congress from doing its work. The substantive offense is thus Count One, and the base offense level for that offense (plus any adjustments) should be applied. |
| Total | 17 | |

**Count Three: 18 U.S.C. § 1752(a)(2)—disorderly or disruptive conduct in a restricted area**

| Base Offense Level: | 10 | U.S.S.G. §2A2.4 |
|---|---|---|
| Total | 10 | |

**Counts Four through Six: entering and remaining on the floor of Congress, disorderly or disruptive conduct, and parading, demonstrating and picketing in a Capitol Building**

| Base Offense Level: | n/a | Because these offenses are Class B misdemeanors, the Guidelines do not apply. See 18 U.S.C. § 3559; U.S.S.G. § |
|---|---|---|

24

| | 1B1.9. |
|---|---|

The government agrees that Moynihan has demonstrated acceptance of responsibility for the offense, and that a three-level reduction under Guidelines Section 3E1.1 is appropriate. *See* PSI ¶¶ 41, 41a.

Moynihan has six prior convictions, resulting in 12 criminal history points:

- 2014 Petit Larceny (6 months) (2 points) (PSI ¶ 44)
- 2015 Petit Larceny (6 months) (2 points) (PSI ¶ 45)
- April 18, 2018 Criminal Possession (9 months) (2 points) (PSI ¶ 48)
- April 19, 2018 Criminal Possession (90 days) (2 points) (PSI ¶ 47)
- May 15, 2018 Criminal Possession (3 months) (2 points) (PSI ¶ 46)
- May 17, 2018 Criminal Possession (4 months) (2 points) (PSI ¶ 46a)

The U.S. Probation Office calculated Moynihan's criminal history as a category V, which is not disputed. PSI ¶ 49. Accordingly, the U.S. Probation Office calculated Moynihan's total offense level at 14, and his corresponding Guidelines imprisonment range at 33-41 months. PSI ¶ 78.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Moynihan's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. The nature and circumstances of Moynihan's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 37 months.

The nature and circumstances of Moynihan's crime weigh heavily towards a term of

incarceration. Moynihan was no mere spectator – he was one of the first rioters to breach the police lines on the east side of the Capitol and he was one of the few rioters who actually made it into the Senate Chamber. He did not walk in – he exerted great effort to push his way through a temporary breach in the Rotunda Door. He did not merely look around, but with his shouting he tried to both encourage his fellow rioters (calling them "patriots") and intimidate the legitimate occupants of the building (accusing them of "treason"). Moynihan did not act spontaneously – he watched for over half an hour as rioters attacked police outside the Rotunda Door, and once inside, proudly boasted, "And we're fucking in!" He was not put off by the violence, or by the fact that his fellow rioters wore combat gear and carried things like zip ties. His reaction was not shock or horror, but pride that he was part of the attack on the Capitol.

Moynihan's half-hour inside the building was longer than many of the January 6 rioters. More importantly, his choice to enter and occupy the Senate Chamber -- the heart of the certification process -- sets him apart from the many rioters who merely roamed the halls and stayed out of sensitive areas. And Moynihan was under no illusion about where he was. As soon as he got to the Senate Chamber, Moynihan bragged on video "I f*cking did it. Stormed the fucking Senate building." Moynihan did not simply occupy the Chamber, but actually searched through a senator's confidential documents, looking for "something" he could use against the people he considered "scumbags."

 All of this took place mere minutes after the Vice President of the United States was evacuated from the Senate Chamber, and as members and staff took shelter from the mob, fearing for their lives. Moynihan's actions halted the normal functioning of the Congress on January 6, 2021, including the certification of the electoral college votes for the 2020 Presidential Election,

and were calculated to do just that. Moynihan literally put himself at the center of that disruption, not only entering the Capitol Building, not only entering the Senate Chamber, but even occupying the Senate dais, which Vice President Pence had occupied less than an hour before.

His words, taken in context with his actions that day, invalidate any notion that the defendant breached the Capitol merely to engage in peaceful, political commentary. As does his reluctance to face the consequences of his actions. At the time of his arrest, he lied to law enforcement and denied that he still had the cellphone he used so avidly at the Capitol. Law enforcement was thus required to obtain two search warrants in order to locate and obtain the phone, which contained incriminating evidence of Moynihan's conduct.

**B.      The History and Characteristics of the Defendant**

Moynihan's crimes on January 6 were not isolated events in an otherwise law-abiding life. He has a much more extensive criminal history than many of the January 6 defendants, including two petit larceny and four drug possession convictions. While all six convictions are misdemeanors, the judges in these matters still felt it appropriate to impose significant sentences for misdemeanor crimes, and his first probationary sentence was revoked because he committed another offense while on probation. His four most recent convictions occurred less than three years before his crimes on January 6, 2021. But these numerous short prison terms did not dissuade Moynihan from committing crimes on January 6.

**C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[4] As with the nature and circumstances of the offense, this factor supports a significant sentence of incarceration. When Moynihan pushed his way into the Capitol, it was abundantly clear to him that lawmakers, and the law enforcement officers trying to protect them, were under siege by rioters. Law enforcement officers were overwhelmed, outnumbered, and in some cases, in serious danger. Moynihan directly added to that danger. His decisions to join a riot mob to stop the certification of the election, to invade the Senate Chamber, and to rifle through a Senator's confidential documents, show utter disrespect for Congress, democracy, and the rule of law.

The government submits that this factor requires a sentence of imprisonment. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that crimes against police, and against Congress, are not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

**D.     The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime

---

[4] FBI Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[5] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on

---

[5] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

### Specific Deterrence

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a term of incarceration. Moynihan's criminal history shows that prior convictions and prior terms of incarceration did not deter him from engaging in criminal conduct on January 6. Moreover, Moynihan's chants of "Treason" as he marched through the Capitol Building, and his encouragement of other rioters as "patriots" demonstrate that Moynihan sees himself as part of an existential battle against those who disagrees with him. His words and his conduct demonstrate that he believes his crimes were justified because they were performed in the name of his political goals.

Moynihan has never expressed remorse for his actions. While some January 6 defendants pled guilty promptly, Moynihan did not agree to a stipulated trial or plead guilty until August 2022 – over a year and a half after his arrest. Unlike many defendants, Moynihan has never offered to speak truthfully with law enforcement about the events of January 6.

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita*, 551 U.S. at 349. As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in

the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

## F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to

impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[6]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Although all the other defendants discussed below participated in the Capitol breach on

---

[6] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

*United States v. Paul Hodgkins*, 21-cr-88-RDM. Hodgkins unlawfully entered the U.S. Capitol at around 2:50 p.m., carrying a backpack that had, among other items, protective eye goggles, rope, and white latex gloves. By 3:00 p.m., Hodgkins made it to the floor of the Senate, where he took several selfies and stood near Moynihan on the dais. However, unlike Moynihan, Hodgkins demonstrated extraordinary acceptance of responsibility and pled guilty very soon after his arrest. Indeed, Hodgkins was the first January 6 defendant to be sentenced for a violation of § 1512(c). Hodgkins, in criminal history category I, faced a 15-21 month sentencing range. Judge Moss granted a downward departure to 8 months.

*United States v. Richard Michetti*, 21-cr-232-CRC. Michetti entered the Upper West Terrace door of the Capitol at 2:35 p.m., within two minutes of the initial breach of that entrance. He confronted officers, yelling "we pay you." Michetti entered the Rotunda, where he shouted at MPD officers "you are starting a civil war." He briefly left the Rotunda but returned to and tried to enter that room again. Only after police officers fired tear gas at him did he leave the building through the Rotunda East doors. Michetti, in criminal history category I, also faced a 15-21 month range. But unlike Moynihan, Michetti agreed to be interviewed by law enforcement and expressed remorse.  This Court sentenced Michetti to 18 months.

*United States v. Jacob Chansley*, 21-cr-3-RCL. Due to his unusual outfit and face paint, Chansley was one of the most noticeable January 6 defendants. Chansley entered the building at

33

around 2:14 p.m., among the first rioters to enter through the Senate Wing Door. He confronted police outside the Senate and carried a bullhorn to rile up the crowd. Chansley entered the Senate Gallery and then entered the Chamber itself. While there, Chansley occupied the dais near Moynihan. Chansley faced a higher sentencing range than Moynihan – 41 to 51 months – because even though he had no prior convictions, he received an enhancement for threatening to cause physical injury. But unlike Moynihan, Chansley demonstrated considerable acceptance of responsibility. On January 7, 2021, he called the FBI to identify himself, and drove to an FBI field office to continue his interview, at which time he was arrested. Chansley was also, like Hodgkins but unlike Moynihan, one of the first January 6 defendants to accept responsibility and plead guilty. Judge Lamberth issued a guidelines sentence of 41 months.

Moynihan's conduct is similar to that of Hodgkins, Michetti, and Chansley, but his criminal history is significantly greater and his lack of remorse is an aggravating factor that was not present in those cases. If Hodgkins or Michetti had the same criminal history as Moynihan, their sentencing ranges would also have been 33-41 months. If Chansley had the same criminal history, his range would have been 77-96 months. Accordingly, a sentence of 37 months, in the middle of Moynihan's guideline range, would not create any undue sentencing disparity.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness

34

Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18

U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims

of most federal crimes." _Papagno_, 639 F.3d at 1096. Second, the Mandatory Victims Restitution

Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A),

"requires restitution in certain federal cases involving a subset of the crimes covered" in the

VWPA. _Papagno_, 639 F.3d at 1096. The applicable procedures for restitution orders issued and

enforced under these two statutes is found in 18 U.S.C. § 3664. See 18 U.S.C. § 3556 (directing

that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under

the VWPA, and "shall" use the procedures set out in Section 3664).

The VWPA and MVRA share certain features. Both require that restitution "be tied to the

loss caused by the offense of conviction." _Hughey v. United States_, 495 U.S. 411, 418 (1990)

(interpreting the VWPA); _see United States v. Clark_, 747 F.3d 890, 897 (D.C. Cir. 2014)

(restitution under the MVRA limited to the "offense of conviction" under _Hughey_).[7] Both require

identification of a victim, defined in both statutes as "a person directly and proximately harmed as

a result of" the offense of conviction.[8] _See_ 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C. §

3663A(a)(2). "In view of the purpose of the MVRA and the interpretation of the VWPA's

definition of 'victim,' we agree with the Government that it is 'inconceivable that ... Congress

somehow meant to exclude the Government as a potential victim under the MVRA when it adopted

---

[7] While both statutes generally limit restitution to losses resulting from conduct that is the basis of the offense of conviction, they also authorize the court to impose restitution under the terms of a plea agreement.   _See_ 18 U.S.C. § 3663(a)(3); 18 U.S.C. § 3663A(a)(3); _see also United States v. Zerba_, 983 F.3d 983, 986 (8th Cir. 2020); _United States v. Giudice_, 2020 WL 220089, at *5 (D.N.J., Jan. 15, 2020).  The defendant in this case did not enter into a plea agreement.

[8] The government or a governmental entity can be a "victim" for purposes of the VWPA and MVRA. _See United States v. Emor_, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

the definition of 'victim' contained in the VWPA.'" *United States v. Ekanem*, 383 F.3d 40, 44 (2d Cir. 2004).

Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019). The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result. *See Emor*, 850 F. Supp. 2d at 202. The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[9] *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that "absolute precision is not required") (citation omitted); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (same); *see also Paroline v. United States*, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader casual process that produced the victim's losses . . .

---

[9] The sentencing court should "articulate the specific factual findings underlying its restitution order in order to enable appellate review." *Fair*, 699 F.3d at 513.  Here, the Court should find that Moynihan's conduct in entering the Capitol building as part of a mob caused damage to that building.

cannot be a precise mathematical inquiry").

The statutes also differ in significant respects. As noted above, the VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose restitution in any case where a defendant is convicted under Title 18 or certain other offenses in Title 21 or Title 49. 18 U.S.C. § 3663(a). In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." _United States v. Williams_, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" _Fair_, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[10]

The VWPA also provides that restitution ordered under Section 3663 "shall be issued and enforced in accordance with section 3664." 18 U.S.C. § 3663(d). Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), see 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's

---

[10] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. See 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

individual contribution to the victim's total losses. 18 U.S.C. § 3664(h). That latter approach is appropriate here.

More specifically, the Court should require Moynihan to pay $2,000 in restitution for his convictions on Counts One through Six. This amount fairly reflects Moynihan's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 37 months' incarceration; three years of supervised release; $2,000 in restitution; and the mandatory $205 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052


BY:      /s/  Robert Juman
ROBERT JUMAN
Assistant United States Attorney
Bar No. NJ 033201993
United States Attorney's Office, Detailee
555 Fourth Street, N.W.
Washington, DC 20530
Phone: (786) 514-9990
E-mail: Robert.juman@usdoj.gov