## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 21-226 (CRC)** |
| | ) | |
| **CHRISTOPHER MOYNIHAN,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Christopher Moynihan, now 32 years old, came to Washington, D.C. from his home in New York State because the President had urged his supporters to come to protest an election that he repeatedly described as fraudulent.  Mr. Moynihan had grown increasingly engaged in politics during the Trump presidency and spent much of his spare time perusing political content on the internet. Encouraged by the President's inflammatory words, Mr. Moynihan decided to travel to Washington, D.C. on January 6 to take part in the rally the President organized. Mr. Moynihan then joined throngs of people who marched to the Capitol following the President's speech, during which the President had urged his followers to go to the Capitol and "fight like hell."  Mr. Moynihan entered the Capitol in a large crowd and ultimately found his way to the Senate chamber, where he looked at papers on a Senator's desk, took video, and briefly stood with others behind the elevated desk at the front of the chamber.  Mr. Moynihan never took any paper, he never altered any paper, and he left everything as it was.  He left the Capitol building after law enforcement officers cleared the Senate chamber without putting up any resistance. While Mr. Moynihan's decision to enter the Capitol and the Senate Chamber is certainly worthy of sanction, it is important

to keep in mind that he did not engage in violence or damage any property on January 6.  He did not taunt, harass, or harm law enforcement officers.  And he accepted responsibility for his conduct instead of going to trial.

In this memorandum the defense will first explain its objections to the calculations of the sentencing guidelines in the Presentence Investigation Report ("PSR").  First, the defense objects to application of the 3-level "substantial interference with the administration of justice" enhancement under USSG § 2J1.2(b)(2).  The total adjusted offense level, taking into account acceptance of responsibility, should be 12. Second, the defense contends that placement of Mr. Moynihan in criminal history category V drastically overstates his criminal history, which consists solely of 4 misdemeanor possession of a controlled substance and 2 misdemeanor petty larceny convictions.  Mr. Moynihan has struggled with addiction to opiates and those convictions all stem from a time when he was in the throes of that addiction.  While on pretrial release in this case, Mr. Moynihan successfully completed 90 days of inpatient treatment and he is now stable and healthy.  Mr. Moynihan should be treated as criminal history category II.  The advisory guideline range for offense level 12 and criminal history category II is 12-18 months.  The memorandum will then go over the relevant sentencing factors under 18 U.S.C. § 3553(a), including the nature and circumstances of the offense and Mr. Moynihan's history and characteristics.  Taking into account the advisory guidelines and all of the sentencing factors under § 3553(a), a sentence here of 12 months and one day is sufficient but not greater than necessary.

## PROCEDURAL HISTORY

Mr. Moynihan was arrested at his home in Salt Point, New York on February 24, 2021.  He was released on bond and has been under Pretrial Supervision since that time.  There have been no violation petitions while this case has been pending.  Mr. Moynihan accepted a finding of guilt as

to Count One and pled guilty to all other charged counts on August 23, 2022. The sole felony charge is Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2). Sentencing is scheduled for February 1, 2023 at 2:00 p.m.

**OBJECTIONS TO GUIDELINES CALCULATIONS**

The only felony charge in this case is Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2). The applicable guideline is § 2J1.2(a). The government calculates the guidelines as follows:

| | |
|---|---|
| Base offense level: | 14 |
| §2J1.2(b)(2): Offense resulted in the substantial interference with the administration of justice | +3 |
| § 3E1.1: Acceptance of responsibility: | -3 |
| **Total offense level:** | **14** |

United States Probation finds that Mr. Moynihan fits in criminal history category V, resulting in an advisory guideline range of 33-41 months incarceration. The defense objects to these calculations on two grounds, each of which will be addressed in turn.

## I.    The Presentence Report incorrectly applies the U.S.S.G. §2J1.2(b)(2) specific offense characteristic.

The PSR added three levels to Mr. Moynihan's total offense level for interference with the "administration of justice" under U.S.S.G. § 2J1.2(b). For the reasons set forth herein and in the Honorable Judge McFadden's opinion on this issue in *United States v. Seefried*, No. 21-cr-287 (TNM)[1], the enhancement does not apply under the circumstances in this case.

The relevant specific offense characteristic provides as follows:

---

[1] Counsel has attached Judge McFadden's Order as Exhibit 1 and incorporates it by reference.

If the offense resulted in substantial interference *with the administration of justice*, increase by 3 levels.

U.S.S.G. §2J1.2(b)(2) (emphasis added). The guidelines application note states that "substantial interference with the administration of justice" includes:

a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources.

U.S.S.G. §2J1.2 cmt. n. 1.

Many courts in this District have held that the certification of electoral votes occurring on January 6 were an "official proceeding," such that obstruction of that certification amounted to a violation of 18 U.S.C. § 1512(c)(2).  Application of the § 2J1.2 enhancement would require this Court to find that the certification *also* involved the "administration of justice."  In *Seefried*, Judge McFadden relied upon legal definitions of "administration of justice" to conclude that "administration of justice" involved a "judicial or quasi-judicial tribunal that applies the force of the state to determine legal rights."  *Seefried* at *4.  He further found that the certification of electoral votes does not share these characteristics, as it is largely a ceremonial proceeding that takes place in the deliberative branch of government rather than branches that typically exercise judgement or force.  He further found that definitions of "interfering with the administration of justice" all establish that the "administration of justice" involves a legal proceeding like a trial or grand jury hearing.

Taken further, courts do not interpret the guidelines in a manner different from their interpretation of statutory text. *E.g.*, *United States v. Martinez*, 870 F.3d 870 F.3d 1163, 1166 (9th Cir. 2017) ("We interpret the Sentencing Guidelines using the ordinary tools of statutory interpretation.").  Thus, the proper inquiry into meaning "will most often begin and end with the

text and structure of the Guidelines." *Id.* "The language of the Sentencing Guidelines, like the language of a statute, must be given its plain and ordinary meaning." *United States v. Fulford*, 662 F.3d 1174, 1177 (11th Cir. 2011). Therefore, courts' construction of the phrase "administration of justice" as it appears in Title 18 should not differ from their interpretation of the same phrase in the guidelines. *Id.*

Here, there is no real debate. Every circuit that has addressed the question has held that the phrase "administration of justice" refers to judicial proceedings. *United States v. Richardson*, 676 F.3d 491, 502-503 (5th Cir. 2012) ("[O]bstructing the due administration of justice means interfering with the procedure of a judicial hearing or trial."); *United States v. Brenson*, 104 F.3d 1267, 1279-80 (11th Cir. 1997) ("due administration of justice" means "judicial procedure" and "the performance of acts required by law in the discharge of duties such as appearing as a witness and giving thoughtful testimony when subpoenaed"); *United States v. Warlick*, 742 F.2d 113, 116 (4th Cir. 1984) (defining obstruction of the "administration of justice" as acts that "thwart the judicial process"); *United States v. Rasheed*, 663 F.2d 843, 851 (9th Cir. 1981) ("administration of justice" commences with "a specific judicial proceeding"). The aforementioned application note to U.S.S.G. §2J1.2(b) bolsters that commonsense reading. Every example of substantial interference with the "administration of justice" involves interference with an investigation or evidence. U.S.S.G. §2J1 cmt. n. 1.

Text aside, law-of-the-case and estoppel principles foreclose application of these specific offense characteristics. As the Court knows, January 6 defendants have filed dozens of motions to dismiss the § 1512(c)(2) charge and in front of every judge of this Court. One of their arguments was that Congress's joint session to count electoral votes does not constitute an "official proceeding" under that statute because, among other reasons, it did not involve the administration

of justice. In response, the government contended that the joint session did not need to entail the administration of justice to constitute an "official proceeding." And in dozens of filings the government all but conceded, that, in fact, the joint session did not administer justice. *See United States v. William Pepe*, 21-cr-52, ECF No. 55 (D.D.C. 2021), p. 8 n. 3 (government: "the certification of the Electoral College vote is not an 'inquiry or investigation'"); *United States v. Knowlton*, 21-cr-46, ECF No. 63 (D.D.C. 2021), p. 12 (government: "The 'proceeding before Congress' is not limited to proceedings solely related to the administration of justice."); *United States v. Nordean*, 21-cr-175, ECF No. 106 (D.D.C. 2021), p. 21 (government acknowledging that although § 1512(c)(2) had "never been applied" outside the context of the administration of justice, the "unprecedently brazen attack" on the Capitol justified application outside that context). The government's arguments on this score led the Court to positively hold that the joint session *does not administer justice*. *United States v. Montgomery*, 578 F. Supp. 3d 54 (D.D.C. 2021) ("Congress does not engage in . . . 'the administration of justice.'"); *see also United States v. Sandlin*, 575 F. Supp. 3d 16, 24 (D.D.C. 2021) ("[T]he Court will not read an 'administration of justice' requirement into 'official proceeding.'").[2]

Having denied defendants' dismissal motions that argued the joint session needed to, but did not, administer justice, the Court cannot find, under the same tools of interpretation, that "administration of justice" now means something different under the Guidelines. Under the law-of-the-case doctrine, "when a court has ruled on an issue, that decision should generally be adhered

---

[2] The government's arguments on this point appear to have evolved from a position that an official proceeding need not be "quasi-judicial" to arguing that the certification of the Electoral College vote does possess "tribunal-like" characteristics. ECF. No. 31 at 30. The government should not be permitted to walk back its earlier position that an "official proceeding" need not administer justice. It was the government's position and district judges relied on it to hold that January 6 defendants obstructed an "official proceeding." The substantial guidelines enhancement, however, should be reserved, as made clear in the plain text of the guideline, for those cases in which defendants obstructed judicial proceedings.

to by that court in subsequent stages in the same case." *United States v. Carr*, 557 F.3d 93, 101 (2d Cir. 2009). The doctrine is "driven by considerations of fairness to the parties, judicial economy, and the societal interest in finality." *Id.*

Indeed, it would be contrary to due process as well as nonsensical to assume that the Sentencing Commission meant to include "official proceeding" though it did not include the phrase in Section 2J1.1. As indicated, the Guidelines are interpreted using the same tools of construction that are employed in the interpretation of statutory text. *Martinez*, 870 F.3d at 1166; *Fulford*, 662 F.3d at 1177. The government and the defense alike cannot read words into the guidelines that the Commission did not include.

It would also be nonsensical to interpret "administration of justice" one way under the Guidelines and a different way in Title 18. It is not just that the interpretive tools are the same. *Martinez*, 870 F.3d at 1166; *Fulford*, 662 F.3d at 1177. It is that §2J1.2 was designed to sentence offenses under § 1503. U.S.S.G. §2J1.2 cmt Statutory Provisions. Section 1503 contains the exact same phrase, "administration of justice." Administratively, it would be chaotic for the phrases to hold different meanings.

Finally, the Probation Office contends in the PSR that the three-level increase applies based solely upon the fact that expenditures for deployment of large numbers of law enforcement personnel and repair of the Capitol amounted to "unnecessary expenditure of substantial governmental or court resources." PSR, p. 23. This is a reference to the definition of substantial interference with the administration of justice in the commentary:

> a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources.

U.S.S.G. §2J1.2 cmt. n. 1.  But the clause about unnecessary expenditure of governmental or court

resources is not independent.  In other words, there still must be a finding of a connection to the administration of justice.  Otherwise, *any* criminal conduct that resulted in expenditure of substantial governmental resources would qualify for this enhancement.  For example, consider a charge of arson that resulted in damage to a Department of the Interior building.   Under the Probation Office's interpretation, this conduct would qualify for a §2J1.2(b)(2) enhancement solely because repair of a fire-damaged government building amounts to "the unnecessary expenditure of substantial governmental resources." But this cannot be. The conduct does not even fit within the government's broad definition of interference with the administration of justice.[3] The specific offense characteristic does not apply here.  The total offense level should be 14, reduced to 12 to reflect Mr. Moynihan's acceptance of responsibility.

## II.    Mr. Moynihan's criminal history category results in a drastic overstatement of his criminal history and a significant downward departure is warranted.

According to the PSR, Mr. Moynihan has twelve criminal history points, resulting in a Criminal History Category of V.  Each of those prior convictions are relatively minor and each conviction is directly linked to Mr. Moynihan's longtime struggles with addiction.   USSG § 4A1.3(b)(1) provides that "[i]f reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted." This is just such a case: Mr. Moynihan's criminal history category both substantially over-represents the seriousness of his criminal history <u>and</u> the likelihood that he will commit other

---

[3] There also appears to be an error at page 24 of the Probation Office's response on this point.  The last paragraph describes a supposed agreement by the defense that the Congressional proceedings on January 6 constituted the administration of justice. The next sentence references a plea agreement.  This must be a reference to a different case, as the defense did not here enter a plea agreement and there was no agreement by Mr. Moynihan that the Congressional proceeding on January 6 constituted the administration of justice.

crimes.

As will be described in more detail below, Mr. Moynihan was a heavy drug user beginning in his 20's and was homeless for long stretches.  During that time, he was arrested and convicted several times – twice for petty larceny and four times for possession of a controlled substance.  To be clear, Mr. Moynihan was a user who was addicted to opiates.  He has never been charged with being involved in the sales of controlled substances. Yet despite the fact that the arrests were directly tied to his addiction, the response of the Town Courts in New York was to put Mr. Moynihan in jail repeatedly.  His last possession of a controlled substance arrest, six years ago, resulted in a nine month jail term.  As a result, under the sentencing guidelines, he receives *eight* total criminal history points based upon four arrests for possession of narcotics and hypodermic needles.  He receives four points for two petit larceny convictions in 2014.  In the first case he stole a speaker and headphones valued at $90 from a Kmart. After a technical violation of his probation, he was sentenced to six months in jail, thus resulting in a two-point conviction.  The second conviction stemmed from the theft of two items from a Home Depot valued at just over $200.  In that case he was sentenced to six months imprisonment, also resulting in two criminal history points.

Mr. Moynihan is by no means comparable to individuals who typically fit within Criminal History category V.  This Court is no doubt familiar with typical examples of individuals in that category.  Many have prior violent convictions, many have been convicted of sales of narcotics, and many have spent long terms in prison.  Mr. Moynihan is entirely different.  In many jurisdictions, people like Mr. Moynihan with addiction issues and criminal conduct related thereto would be diverted into drug court rather than being subjected to lengthy jail sentences. Mr. Moynihan has no prior offenses involving violence, damage to property, or sales of narcotics.  His

recent completion of inpatient treatment, also discussed below, should provide the Court with further assurance that he is unlikely to commit other crimes.  This Court should depart downward by three levels under U.S.S.G. § 4A1.3(b)(1) to reflect the fact that Mr. Moynihan's criminal history category substantially over-represents the seriousness of his criminal history and the likelihood that he will commit other crimes.

Assuming an offense level of 14, reduced by 2 levels for acceptance under U.S.S.G. § 3E1.1, the total adjusted offense level is 12. After application of the three level departure pursuant to U.S.S.G. § 4A1.3(b)(1), his Criminal History Category would be II and the resulting advisory guideline range would be 12-18 months.  As will be illustrated herein, a sentence in this range would also be more consistent with sentences imposed in the cases of individuals whose conduct on January 6 was comparable to Mr. Moynihan's.

## APPLICATION OF THE SENTENCING FACTORS

The primary directive in § 3553(a) is that the Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with" the purposes of sentencing. *See* 18 U.S.C. § 3553(a) (emphasis added).  Honest application of the federal sentencing statute confirms that a sentence of probation to include community service is sufficient but no greater than necessary to meet the goals of sentencing.  What follows is a detailed review of the relevant §3553(a) factors.

### I.      Mr. Moynihan's history and characteristics.

Christopher Moynihan is the oldest of three children born to Jerome and Elena Moynihan in Poughkeepsie, New York, approximately 85 miles North of New York City.  The family now lives in Salt Point, a small town eleven miles further North.  Mr. Moynihan's father worked as a

correctional officer and his mother was a homemaker.  As a teenager Christopher enjoyed playing guitar and was a fan of punk music including the band The Ramones.

Christopher struggled in school and started drinking and smoking marijuana as a teenager. At approximately 17 years old he was sent to a group home for approximately two years.  There were six teenagers per room, fights were common, and Mr. Moynihan felt that he was becoming institutionalized. In hindsight, his father feels that he bears some responsibility for Christopher's difficulties during childhood.  He writes:

> At a young age, Chris suffered academically in school. He failed the 5th grade and never seemed to get over it, but the real failure was mine. I was severely derelict as his father, the most important role model a boy has. I spent my time working 16 hour days almost every day in an effort to provide my wife with the material things she lacked having grown up in severe poverty. While I thought I was showing him a strong work ethic, all he felt was abandoned by me, and he sought to numb that pain.

Letter of Jerome Moynihan, attached at Exhibit 2.

Mr. Moynihan deeply admired his grandfather, who served in the Marine Corps. Mr. Moynihan aspired to follow in his grandfather's footsteps but when he tried to enlist he was told that the GED that he had obtained was insufficient – he needed some college credits.  He fell deeper into drug use and ultimately succumbed to addiction to heroin, a drug that he used intravenously.  His life was entirely unstable; he moved between living situations, jobs, and drug programs. As his use became more and more destructive, he became homeless and estranged from his family for a time.

Treatment helped Mr. Moynihan take a turn for the better a few years ago.  He started attending regular AA meetings and worked with a sponsor to get clean. His father reports that he even helped others who were going through the same difficulties battling addiction:

> One of the steps involved his making whole those whom he wronged. He sincerely
> apologized to each family member for all that he had put us through. That was the
> beginning of forming and nurturing a relationship between us.

Jerome Moynihan letter.  He completed a methadone program and returned to his parents' home,
where he spent much of his free time reading.  He found work locally doing plumbing, carpentry,
and restaurant work.  In the meantime, he attended church with his parents on Sundays and
discussed the possibility of entering seminary. He found work at IBM and worked there for two
years before choosing to take steps to fulfill his dream: joining the Army.  He had always looked
up to people in the military and his grandfather in particular.  He exercised and focused on his
health so that he could lose weight.  He prepared for the entrance test, filled out materials online
and met with a recruiter.

Mr. Moynihan's arrest in this case put an end to his dreams of joining the Army.  He shifted
gears and found work at a local hardware store but after his arrest in this case was publicized in
local media and online, he was terminated from that job.  He found work in the restaurant of a
local golf course but the loss of his previous job as well as the realization that he would never
make it into the military left him despondent. He started smoking again, then drinking, then
overdosed and ended up in the hospital. When medical personnel believed that he might be suicidal
he was placed on psychiatric wards at Mid Hudson Regional Hospital and Westchester County
Medical Center.

But Mr. Moynihan has rebounded. Upon release from the hospital, he entered intensive
inpatient treatment at Samarian Daytop Village. While there he took part in individual and group
counseling, psycho-educational seminars, and self-help meetings. PSR, ¶64a. He successfully
completed a full 90 days in the program last month. Certificates from Samaritan Village are
attached at Exhibit 4.  Mr. Moynihan not only took part in daily counseling sessions, but he also

sought out additional groups, including Thinking Errors, Thinking for a Change, and Anger Management. He is now back with his parents and they report that he is doing well. He is engaged in an additional 90 days of intensive outpatient treatment through the Lexington Center for Recovery. He attends counseling mornings of three days per week and finds it very helpful. Dialectical Behavioral Therapy is one focus.[4]

Mr. Moynihan has been doing well enough following his discharge from inpatient treatment that he has started working again. He is now working as a cook at a restaurant in a private airport near his home. He is happy to be back at work and especially happy to be working in a kitchen because cooking is the work he enjoys most. When he is not working and in counseling, Mr. Moynihan spends his days reading, exercising, cooking for the family, and helping to care for his grandmother, who also lives in the home. All signs are that he is back on the right track.

## II.     The nature and circumstances of the offense.

Mr. Moynihan came to Washington, D.C. on January 6 because President Trump encouraged American citizens to come to this city.  Whatever one thinks about Donald Trump, it cannot be ignored that he was not a normal civilian at the time of these events.  He was the *President of the United States*; the highest official in our country having been elected in 2016 with the votes of several million Americans. He lived in the White House, his speeches were covered by all national news networks, he spoke behind a podium with the Presidential seal, and he had full United States Secret Service protection. Mr. Moynihan felt a unique allegiance to President Trump because his income was higher during the Trump presidency than any other previous presidency. He along with hundreds of thousands of others were agitated by alarmist reports that voting machines had been rigged as well as other baseless theories that were rampant in the online

---

[4] The defense will ask for a surrender date in the beginning of April so that Mr. Moynihan can complete his outpatient counseling program prior to surrendering to serve his sentence.

arena. The President and his coterie were calling for an investigation and Mr. Moynihan was a receptive audience. He believed that the rally would be focused on promoting an investigation into the election. The President of the United States, who had promised that the event would be "wild," urged these citizens to march to the Capitol after giving an incendiary speech emphasizing the importance of this moment in history and the necessity of fighting to stop the certification of the election. President Trump, after several minutes of reiterating his claims that the election was stolen, said the following to the crowd (including Mr. Moynihan):

> We will not let them silence your voices. We're not going to let it happen, I'm not going to let it happen…..We're gathered together in the heart of our nation's capital for one very, very basic and simple reason – to save our democracy….Now, it is up to Congress to confront this egregious assault on our democracy. And after this, ***we're going to walk down, and I'll be there with you***, we're going to walk down…I know that everyone here will soon be marching over to the *Capitol building* to peacefully and patriotically make your voices heard….And they want to recertify their votes…**But the only way that can happen is if Mike Pence agrees to send it back…If not…you will have an illegitimate President.** That's what you'll have. And we can't let that happen…**We must stop the steal** and then we must ensure that such outrageous election fraud never happens again….**And we fight. We fight like hell**. **And if you don't fight like hell, you're not going to have a country anymore…..So we're going to, we're going to walk down Pennsylvania Avenue…And we're going to the Capitol, and we're going to try and give them the kind of pride and boldness that they need to take back our country.. So let's walk down Pennsylvania Ave.**[5]

Later that day, even as the Capitol building was under attack, the former President Trump did and said nothing for hours.[6] The only thing he did during the crucial hours of the attack was post a Tweet at 2:24 p.m. saying "Mike Pence didn't have the courage to do what should have

---

[5] Associated Press, *Transcript of Trump's Speech at Rally Before US Capitol Riot*, U.S. News & World Report, Jan. 13, 2021, available at https://www.usnews.com/news/politics/articles/2021-01-13/transcript-of-trumps-speech-at-rally-before-us-capitol-riot (last viewed on Nov. 22, 2022). (emphases added).

[6] Jonathan Allen, *On Jan. 6, Trump ignored all pleas to call off the mob attacking the Capitol while 'pouring gasoline on fire' aide says*, NBC News, July 21, 2022, available at https://www.nbcnews.com/politics/congress/prime-time-jan-6-hearing-focuses-trumps-inaction-187-minutes-mayhem-rcna36737

been done to protect our country and our Constitution."[7] While this by no means excuses the actions of the citizens who entered the Capitol, and certainly not those who engaged in violent conduct, it provides context for Mr. Moynihan's actions: he was acting in response to repeated statements by the President of the United States that, at a minimum, suggested that strong Americans should not stand down and permit the certification to occur. The Honorable Amit P. Mehta alluded to this issue in a recent sentencing hearing encouraging us all to ask ourselves why ordinary American citizens from all over the country came together to commit these acts. *United States v. Andrew Cavanaugh*, 21-cr-362 (APM), Sentencing Transcript at 26-28. Judge Mehta opined that this was able to occur because of:

> [T]he power of propaganda; the power of being told lies over and over and over again; told by leaders who knew better, that something was taken away from people when it wasn't…The idea that people who have otherwise led modest and humble lives, who have not been political agitators, political activists, are now facing serious jail time is extraordinary. *Id*.

Mr. Moynihan joined the throngs of people walking towards the Capitol after President Trump's speech.  He entered the Capitol with a large crowd of people, walked through the halls chanting along with others in the crowd, and walked into the Senate chamber.  There, he looked through papers on a Senator's desk, taking video with his phone. At one point, he said to himself: "There's gotta be something in here that we can fucking use against these scumbags." Mr. Moynihan was so convinced by President Trump's claims that the election had been stolen from him that he believed that there would be some evidence of election fraud among the papers on whichever Senator's desk he happened to find himself in front of.  Mr. Moynihan then wandered up to the dais, where he stood, without making any statements or touching anything, along with a

---

[7] Ewan Palmer, *Donald Trump Tweeted Attack on Mike Pence Minutes After Hearing VP Was Fleeing Capitol Rioters*, Newsweek, February 11, 2021 available at https://www.newsweek.com/donald-trump-tweeted-attack-mike-pence-minutes-capitol-rioters-1568568. (last viewed on November 29, 2022).

group of people. When law enforcement came into the chamber, Mr. Moynihan left the chamber and the Capitol building without any resistance. He did not take anything, he did not destroy anything, and he did not alter anything while inside the Capitol.  Other than his relapse – which he has since addressed through inpatient and outpatient treatment – Mr. Moynihan has abided by his strict conditions of release during the pendency of this case without incident, showing his respect for the law and for this Court.

## III.    The need to avoid unwarranted disparities.

The defense here provides examples of cases involving other defendants who engaged in conduct comparable to Mr. Moynihan's.  Specifically, individuals who entered the Capitol, walked into the Senate chamber, and went to the dais.

*United States v. Paul Hodgkins, No. 21-cr-188 (RDM)*



**Mr. Hodgkins at the dais with Mr. Moynihan behind him**

Mr. Hodgkins took rope, protective eye goggles, and latex gloves into the Capitol.  Once inside the Capitol, he put on his eye goggles and entered the Senate chamber. He walked to the well and stood at the dais with flag in hand. He was seen in the well of the Senate taking photographs and putting on latex gloves. ECF No. 1.  Mr. Hodgkins was convicted of the same felony offense as Mr. Moynihan, 18 U.S.C. § 1512, and was sentenced to 8 months' incarceration. The government seeks to distinguish Mr. Moynihan from Mr. Hodgkins in two ways, each of which is unconvincing.  First, the government reports that Mr. Hodgkins pled guilty quickly.  As will be explained in more detail below, Mr. Moynihan's case moved slower than it otherwise would have

because he had a change of counsel mid-way through his case.  His relapse and inpatient treatment also slowed things down a bit.  But the pace of his case is by no means attributable to an unwillingness by Mr. Moynihan to accept responsibility quickly.  The government also points to the fact that Mr. Moynihan's criminal history is more serious than Mr. Hodgkins'.  This is true, but again, Mr. Moynihan's record is directly related to his addiction; his only convictions are possession and petty larceny misdemeanors.  In comparison, Mr. Hodgkins' possession of protective eye goggles, rope, and white latex gloves certainly suggests he had far more troubling plans when he entered the Capitol than did Mr. Moynihan.  In any event, to the extent there is any distinction between the two defendants, the 12 month and a day sentence (four months more than Hodgkins' sentence) suggested by the defense here for Mr. Moynihan surely accounts for it.

_United States v. Christine Priola, No. 22-cr-242 (TSC)_


**Ms. Priola at the dais**

Ms. Priola carried a large sign reading "WE THE PEOPLE TAKE BACK OUR COUNTRY" on one side and "THE CHILDREN CRY OUT FOR JUSTICE" on the other.  Once she had entered through the Rotunda door, Ms. Priola held her sign to a window, knocked on the glass and gestured to the crowd below.  She then made her way to the Senate chamber, where she made telephone calls, including to an associate who was outside the building, to whom she said: "Everybody has to get in her now.  This is now or never."  ECF No. 56.  While on the Senate floor she took photographs and video and stood next to the dais of the Senate.  She then deleted data from her phone for the period from January 4 through 7, 2021.

Ms. Priola was convicted of the same felony offense as Mr. Moynihan, 18 U.S.C. § 1512, and was sentenced to 15 months' incarceration by Judge Chutkan.

*United States v. Tommy Allan, No. 21-cr-64 (CKK)*

 

**Mr. Allan at the dais**

After climbing a rope up the side of the Capitol, Mr. Allan entered the building though a fire door next to the Senate Parliamentarian's office which had been broken open by rioters. He entered the Parliamentarian's office and then walked through the halls of the Capitol for approximately 15 minutes, during which time he stole an American flag. He joined a group of rioters confronting Capitol Police officers near the North Door and put himself at the front line. When rioters pushed through this police line, he climbed up a flight of stairs and entered the Senate chamber. While inside, he stood on the dais as fellow rioters chanted slogans, and stole paperwork from the front desk as well as the desk of Senate Majority leader Mitch McConnell. After Capitol Police forced rioters out of the Senate chamber, Allan was made to give up his flag and escorted out of the building. Allan held up his stolen papers like a trophy to the crowd outside, and then crossed the street and bragged on a Facebook live stream about his exploits, claiming that he scaled a wall to get into the Capitol, and proudly displaying the stolen documents. When he returned home, Allan deleted his Facebook account and destroyed the documents he had stolen in an effort to hide the evidence of his unlawful conduct. Allan declined to be interviewed by law enforcement officers when they visited his home a week later. The next day got rid of his cellphone because it contained evidence of his participation

in the attack.  Mr. Allan was convicted of theft of government property as well as 18 U.S.C. § 1512 and was sentenced to 21 months incarceration by Judge Kollar Kotelly.  Mr. Moynihan did not climb a rope up a wall of the Capitol.  He did not steal an American flag.  He did not steal papers from the Senate chamber and display them to a crowd nor did he livestream his actions to an audience.  His conduct was far less serious than Mr. Allan and his sentence should reflect that fact.[8]

<u>United States v. Richard Michetti, No. 21-cr-232 (CRC)</u>

The government cites Mr. Michetti as a § 1512 defendant sentenced by this Court.  Mr. Michetti is an example of a defendant who had active, hostile interactions with police officers. This is something Mr. Moynihan never did.  Mr. Michetti was part of a mob that tried to force its way past a line of MPD officers in the hallway of the Old Senate Chamber.  He yelled at the police officers: "We feed your family'" "you are just taking orders"; and "who do you work for – you get paid by us!" ECF No. 46. As he pushed against officers he called them "fucking animals" and later pinched the sleeve of one officer. In the Rotunda he approached other officers and yelled: "You know you caused a civil war.  You know that right?"  Police almost succeeded in herding him out of the building but he returned to the Rotunda, again confronting law enforcement officers face-to-face.  In a text to an acquaintance afterwards, he wrote that "The cops were the aggressors for no reason today."  Mr. Michetti was convicted of the same charges as Mr. Moynihan and this Court sentenced him to 18 months.

---

[8] Other than Mr. Chansley, the other individuals the defense was able to identify who stood at the dais are still either awaiting trial or have sentencing dates in the coming months.

**IV.     Other sentencing factors are met by a sentence of one year and a day.**

One year and one day in prison will serve as a just punishment and adequate deterrent.  The

sentence would be the longest Mr. Moynihan has ever served.  He has spent time in local jails after

his drug-related arrests, but he has never been to prison and had never seen the inside of a federal

courtroom.  This case has had a sobering effect on him. He needs no further specific deterrence.

The government faults Mr. Moynihan for not agreeing to a stipulated trial or to plead guilty

until a year and a half after his arrest. This delay should not be attributed to Mr. Moynihan. Mr.

Moynihan's first lawyer left the Federal Public Defender office partway through his case and the

undersigned took over and required time to become familiar with the case and Mr. Moynihan while

also getting up to speed on many other new cases. These cases have raised significant and

complicated legal issues that counsel wished to address before reaching a resolution.  It would be

entirely unfair to penalize Mr. Moynihan for not pleading guilty sooner under these circumstances.

The government also faults Mr. Moynihan for not offering to meet with law enforcement about

the events of January 6. While some defendants might seek credit for provision of information to

law enforcement about their involvement, all defendants retain a Fifth Amendment right not to

have ongoing discussions with law enforcement, particularly while their case is pending.  And in

the vast majority of federal criminal cases resolved with a plea, defendants do *not* have further

meetings with law enforcement, unless they are seeking some sort of § 5K1.1 reduction. Mr.

Moynihan is not seeking cooperation credit because it is not warranted, but he certainly should not

be penalized in any way for not volunteering to meet with law enforcement while this case has

been pending.

As for general deterrence, sentencing Mr. Moynihan to more than a year in prison for

entering the Capitol with the intent to delay the certification of the vote is not the salve that the

country needs to ensure that January 6 was an isolated horror. To the extent there is a need to send a message to the public to ensure that no such event occurs again, sending Mr. Moynihan to prison for one year is certainly adequate to serve that purpose.  Further, empirical evidence proves that the certainty of prosecution, rather than the severity of punishment is the greater deterrent.[9] To this end, the Justice Department moved swiftly to prosecute "low hanging fruit" like Mr. Moynihan — men and women who, at the invitation of the President of the United States and other powerful people, attended a rally, the very title of which suggested that its goal was to stop the certification of the election. Yet, while requesting prison sentences that will surely devastate the lives and families of average Americans, many of whom attended the rally because they were fed lies by prominent politicians and the President that the election had been "stolen," the Justice Department has neglected to charge the most culpable, namely those that organized and incited the event.[10] This is significant because the types of individuals willing to participate in an event like January 6 are only going to be deterred if the individuals responsible for the event, namely, the organizers and executors, face criminal charges and incarceration. Likewise, imposing harsh prison sentences on men like Mr. Moynihan while letting the powerful organizers off scot free will undermine respect for the law rather than promote it.

Finally, with respect to rehabilitation, Mr. Moynihan is well on his way, having taken commendable steps to address his substance abuse disorder after a real scare last year.  A sentence

---

[9] *See* National Institute of Justice, *Five Things About Deterrence* (June 5, 2016), full article available at https://nij.ojp.gov/topics/articles/five-things-about-deterrence

[10] *See* Sentencing Transcript in *United States v. Cavanaugh*, 21CR362 (The Honorable Judge Mehta states, "It really does, in my mind, go to the power of propaganda; the power of being told lies over and over again; told by leaders who knew better, that something was taken away from the people when it wasn't. . . people were told over and over again that was not true, so much so that the people like [the defendant] lost his way.").

of one year and one day is sufficient but no greater than necessary to achieve the goals of sentencing, including the need to achieve correctional treatment in the most effective manner.

## CONCLUSION

For the foregoing reasons and such others as may be presented at the sentencing hearing, Mr. Moynihan respectfully requests that the Court impose no more than one year and one day of incarceration and no more than $100 in special assessments, and that the Court recommend that the Bureau of Prisons house him in a facility that offers ongoing drug treatment in proximity to Poughkeepskie, New York. Finally, Mr. Moynihan agrees with the PSR's assessment that he is not in a position to pay a fine.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/
_____

Ned Smock
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500
Ned_Smock@fd.org