```
 1                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
 2
            - - - - - - - - - - - - - - - x
 3      THE UNITED STATES OF AMERICA,
                                                Criminal Action No.
 4                      Plaintiff,              1:21-cr-00226-CRC-1
                                                Wednesday, February 1, 2023
 5      vs.                                     2:04 p.m.

 6      CHRISTOPHER PATRICK MOYNIHAN,

 7                      Defendant.
            - - - - - - - - - - - - - - - x
 8

 9      _____

10                   TRANSCRIPT OF SENTENCING HEARING
             HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                     UNITED STATES DISTRICT JUDGE
        _____
12      APPEARANCES:

13      For the United States:      ROBERT CRAIG JUMAN, ESQ.
                                    U.S. ATTORNEY'S OFFICE
14                                  500 E. Broward Blvd.
                                    Ft. Lauderdale, FL 33132
15                                  (786) 514-9990
                                    robert.juman@usdoj.gov
16
        For the Defendant:          EDWARD SMOCK, ESQ.
17                                  FEDERAL PUBLIC DEFENDER FOR D.C.
                                    625 Indiana Avenue, NW
18                                  Suite 550
                                    Washington, DC 20004
19                                  (202) 208-7500
                                    ned_smock@fd.org
20

21      Court Reporter:             Lisa A. Moreira, RDR, CRR
                                    Official Court Reporter
22                                  U.S. Courthouse, Room 6718
                                    333 Constitution Avenue, NW
23                                  Washington, DC  20001
                                    (202) 354-3187
24

25
```

P R O C E E D I N G S

1
2          THE COURTROOM DEPUTY:  Your Honor, we're on the
3     record for Criminal Case 21-226, *The United States of*
4     *America vs. Christopher Patrick Moynihan.*
5          Counsel, please approach the lectern and identify
6     yourself for the record starting with the government.
7          MR. JUMAN:  Good afternoon, Your Honor; Robert
8     Juman for the United States.
9          THE COURT:  Mr. Juman.
10         MR. SMOCK:  Good afternoon, Your Honor; Ned Smock
11    from the Federal Public Defender's office for Mr. Moynihan.
12         THE COURT:  Mr. Smock, how are you?
13         MR. SMOCK:  Good.  And yourself?
14         THE COURT:  Good.
15         Okay.  Mr. Moynihan, feeling all right today?
16         HE DEFENDANT:  Yes, Your Honor.
17         THE COURT:  Are we ready to proceed?
18         THE DEFENDANT:  Yes, Your Honor.
19         THE COURT:  Okay.  The Court has read the
20    presentence investigation report; the memoranda that
21    have been submitted by both sides.  I've read letters
22    submitted by the defendant's parents as well as from a
23    friend, Ms. Dell'Orso, and various certificates from the
24    Samaritan Village Treatment facility.
25         Anything else for the Court's consideration in

1    writing?

2              MR. SMOCK:  No, Your Honor.

3              THE COURT:  Mr. Juman?

4              MR. JUMAN:  Your Honor, I just want to confirm as

5    a point of procedure -- we submitted exhibits via video.  I

6    wanted to make sure the Court received those and had a

7    chance to review them.

8              THE COURT:  Yes, I have reviewed at least some of

9    the videos.  If there are any that you'd like to play for

10   the Court's consideration at sentencing, you should feel

11   free to hook up your laptop and do that.  And we can give

12   you some time to set up, if you need that.

13             MR. JUMAN:  Okay.

14             THE COURT:  All right.  Just hold on here.  Let me

15   get situated.

16             We also have Ms. Landon from probation here with

17   us today, for the record.

18             All right.  Starting with the factual findings in

19   the presentence investigation report, any unresolved

20   objections that have not already been noted for the record?

21             Mr. Smock?

22             MR. SMOCK:  No, Your Honor.

23             THE COURT:  And Mr. Juman?

24             MR. JUMAN:  No, Your Honor.

25             THE COURT:  Okay.  Mr. Moynihan, has Mr. Smock

1    reviewed the presentence investigation report with you?

2                THE DEFENDANT:  Yes, Your Honor.

3                THE COURT:  You've read it?

4                THE DEFENDANT:  Yes, Your Honor.

5                THE COURT:  Okay.  And have you been satisfied

6    with his services thus far in the case?

7                THE DEFENDANT:  Yes, Your Honor.

8                THE COURT:  Great.

9                All right.  Hearing no objection, the Court will

10   accept the factual findings in the PSR regarding the

11   circumstances of the offense; and, therefore, those facts,

12   as stated in the PSR, will be adopted by the Court for

13   purposes of sentencing.

14               Moving to the Sentencing Guidelines calculation.

15   The defendant was convicted after a stipulated bench trial

16   on the 1512 count, and he pled guilty via a plea agreement.

17   Is that right, Mr. Smock, on Counts 2 through 5?

18               MR. SMOCK:  No, there was no plea agreement.

19               THE COURT:  There was no plea agreement.

20               He pled guilty to the indictment on Counts 2

21   through 5.

22               The lead count, obstruction of justice or

23   obstruction of an official proceeding, carries a base

24   offense level of 14.  The probation office increased that

25   level by three because the defendant's conduct interfered or

1    caused a substantial interference with the administration of

2    justice.  There was a three-point reduction for acceptance

3    of responsibility and prompt plea, leading to a total

4    offense level of 14.

5             The defendant was assigned, I believe, 12 criminal

6    history points based on a 2014 petty larceny in

7    Poughkeepsie, New York, which was two points; 2014 petty

8    larceny, also in Poughkeepsie, another two points; a 2017

9    drug possession conviction in LaGrange, New York, two

10   points; 2017 drug possession in Wappinger Falls, New York,

11   another two points; 2017 drug possession for heroin in

12   Highland, New York, two points; and a final 2017 drug

13   possession in Poughkeepsie, New York, for two points.  That

14   places the defendant in Criminal History Category 5.

15             Level 14 at Category 5 results in an advisory

16   Sentencing Guidelines range of 33 to 41 months, supervised

17   release of one to three years, a fine of $7,500 to $75,000,

18   and because there was no plea agreement, there was no

19   agreed-to restitution amount.

20             Is that correct?

21             MR. SMOCK:  That's correct, Your Honor.

22             THE COURT:  Okay.  Did I get that right,

23   Mr. Juman?

24             MR. JUMAN:  Yes, Your Honor.

25             THE COURT:  Mr. Smock?

```
 1                    MR. SMOCK:  Yes, that's correct.

 2                    THE COURT:  Okay.  And there's been an objection

 3          to the -- by the defense to the three-point enhancement for

 4          substantial interference with the administration of justice.

 5                    I've read your papers, Mr. Smock.  Would you like

 6          to be heard further on that?

 7                    MR. SMOCK:  Your Honor, I don't have additional

 8          argument beyond what was set forth in the papers.

 9                    THE COURT:  Okay.  So on that issue, you've

10          presented a more comprehensive argument than I have heard in

11          the past.  As you know, I have -- I'm on record as having

12          applied that enhancement in other cases.  I will stand by

13          that position here although I do think it's a colorable and

14          arguable question, and you've done a nice job of arguing it.

15                    But I do think that the enhancement is broad

16          enough to apply to other proceedings other than simply

17          judicial proceedings, and, as I and other judges have ruled,

18          there is a quasi judicial nature to the certification

19          proceedings that took place on January 6th.  So I will join

20          my colleagues who have applied that connection -- that

21          enhancement based on the financial effect the defendant and

22          others' actions caused to the Capitol that day.

23                    All right.  The Court has received a

24          recommendation from the probation office, which I believe

25          has been disclosed to the parties, of 33 months, which is
```

1    the low end of the calculated range, 36 months supervised

2    release, and no additional fine.

3            All right.  Mr. Juman, do you want to be heard on

4    the 3553(a) factors?

5            MR. JUMAN:  Yes, Your Honor, and if it's okay,

6    I'll bring my laptop up with me.

7            THE COURT:  And if you could, try to speak into

8    the microphone for the benefit of the court reporter.  And

9    you can move the mic, if you --

10            MR. JUMAN:  Oh, I see.  That's fair, okay.

11            All right.  Your Honor, as a technical matter, I'd

12    like to start by formally moving to offer Exhibits 1 through

13    14 that we submitted to the Court electronically.

14            THE COURT:  So moved.

15            MR. JUMAN:  Okay.

16            Your Honor, two years have passed since January

17    6th, and as more of these cases work their way through the

18    Courts, it gets easier to forget how absolutely unique

19    January 6th was.

20            This isn't just another case.  For the first time

21    in this country's history an ill-informed, angry, and

22    violent mob stopped the peaceful transition of power, and a

23    crime of this magnitude demands an equally serious sentence.

24            Now, before I talk about Mr. Moynihan's conduct on

25    January 6th, I want to be clear that Mr. Moynihan is not

1    being punished for his political beliefs.  He has an

2    absolute right to think and say whatever he wants.  He's

3    free to think the earth is flat or that anyone who disagrees

4    with him is somehow a communist.  But his political beliefs,

5    whatever they are, do not give him license to commit crime,

6    and that's precisely what happened on January 6th.

7          And let's also be clear this case is not about his

8    decision to come to Washington.  It's not about his decision

9    to attend the rally or even his decision to walk to the

10   Capitol.  This case is about what he did after he arrived at

11   the Capitol and saw that the police had established a

12   perimeter around it.  It's about him rushing through the

13   fallen police barricades, pushing past the broken police

14   line on the east steps, and about his decision to force his

15   way into the Capitol knowing that the police were being

16   attacked by that angry mob.

17         And in order to give the Court the full picture of

18   what Mr. Moynihan saw before he entered, we had submitted --

19   it's Exhibit 6.  It's a very long video.  It's about 17

20   minutes, so I won't play it now, but I just wanted to note

21   we provided the Court that long video to give you an idea of

22   how long Mr. Moynihan was out there and all the

23   opportunities he had to turn away.  And it shows that

24   whatever he thought at the rally, by this time he's under no

25   illusion about what's happening.

1              This is not a peaceful protest.  This is not a

2     request for investigation.  This is an attack on the Capitol

3     and on the police defending it.  And despite knowing that,

4     he didn't turn away.  He joined the mob, and he pressed

5     forward.

6              And we know this was his mindset because we can

7     hear his own reaction to getting inside, and I'd like to

8     play Exhibit 9 for you.  This is a cell phone recording that

9     Mr. Moynihan made.  It's Exhibit 9, and let me see if this

10    works.

11             (Video playing)

12             MR. JUMAN:  I think it's better if I switch the

13    audio to my laptop.

14             THE COURT:  Take your time.

15             (Pause)

16             MR. JUMAN:  This should work.

17             (Video playing)

18             MR. JUMAN:  I'll stop it at that point.

19             Your Honor, it's hard to hear because it comes at

20    the very beginning, but Mr. Moynihan doesn't say -- when he

21    first gets in, he says, "We're in."  Not, "I'm in," but he

22    says, "We're in," indicating that he's proud to be part of

23    this mob.  And once inside he heads for the Senate Chamber

24    as shown in this video.

25             But he doesn't just walk there.  As he walks, as

1    Your Honor just heard, he's encouraging his fellow rioters.

2    He's calling them patriots, and he's shouting "treason."

3    He's riling up the same people he's already seen outside who

4    were attacking the police.

5          And he's not the only one doing this, but the

6    thing about mobs is that each participant encourages the

7    others.  Just as Mr. Moynihan may blame his conduct on the

8    others he was with, they would equally blame their conduct

9    on him.  And he's shouting "treason."

10          And I'll jump ahead in Exhibit 9 now --

11    actually, no, I will switch to Exhibit 10 with the Court's

12    indulgence.  This is a video from the Court security -- the

13    building security cameras.  There's no audio on this, but

14    Mr. Moynihan will be showing up shortly.  He's indicated by

15    the highlighted area after taking a drink of water from the

16    water fountain.  And you can see him shouting as he walks

17    past those offices.

18          And I think what this exhibit shows is that even

19    though there's no audio, you can feel the anger.  You can

20    see the anger on his face.  You can tell that he's not here

21    for an investigation.  He's already made up his mind, and

22    he's furious.

23          And you can see the offices he's walking past.  He

24    has no regard for the staffers who might be behind those

25    doors terrified, possibly hiding under their desks, as the

1    angry mob runs through the Capitol.

2            Now, after this, he gets to the Senate Chamber,

3    and, again, demonstrating that it's no accident, he records

4    another video.  That's Exhibit 12.  I'd like to play that

5    briefly.

6            (Video playing)

7            MR. JUMAN:  And so, Your Honor, it's clear from

8    Mr. Moynihan's comments that he's proud of what he's done.

9    "I F'ing did it.  Stormed the F'ing Senate building."

10           He walks around the chamber.  He occupies the dais

11   next to the QAnon Shaman.

12           Those pictures have been splashed around the

13   world.  He doesn't mind that other rioters are wearing

14   tactical gear and carrying zip ties, as we showed in some of

15   the scenes in our sentencing memo.

16           And then he rifles through that senators' papers.

17   And that's Exhibits 13 and 14, which, again, they're

18   longer -- I won't be playing them -- but the key phrase

19   there is he's looking for something he can F'ing use against

20   these scumbags.

21           Who is Mr. Moynihan talking about?  He's talking

22   about people who he's already decided have stolen the

23   election.  That's why he uses that word.  He doesn't want an

24   investigation.  He's already made up his mind.  And his

25   memo, Mr. Moynihan's sentencing memo, cites this language as

1    an indication that he had been so convinced by the former

2    president's lies that he thought he would find evidence

3    there.

4            But, Your Honor, that's exactly the problem.  It's

5    like that line you often hear in movies.  Shoot first, ask

6    questions later.  If you are so sure the election's been

7    stolen that he feels justified in attacking the police,

8    invading the Capitol, forcing senators to flee the chamber,

9    you had better already have the evidence.  You'd better

10   already have so much evidence that you don't care what's on

11   the senator's desk.

12           THE COURT:  So let me stop you there.  He was

13   interviewed by the FBI, correct?

14           MR. JUMAN:  He was interviewed after his arrest.

15           THE COURT:  Right, but not by you all, because

16   there was no plea agreement; is that correct?

17           MR. JUMAN:  I guess the way I would put it is he

18   was interviewed after his arrest.  He did not want to talk

19   about his activities at the Capitol.  He did spend time

20   talking about his political views.

21           THE COURT:  Right.

22           MR. JUMAN:  After that, he never offered to speak

23   with us, and obviously he's represented by counsel so we

24   couldn't approach him directly.

25           THE COURT:  So I take it he has not explained

1    precisely what he was looking for or whose desk he was -- or

2    whose materials he was after?

3            MR. JUMAN:  Well, the video actually indicates he

4    does know that.  He believes he's at Senator Cruz's desk.

5    So he mentioned Cruz.  I think another rioter mentions

6    Hawley; or he mentions Hawley, but mispronounces it.  And,

7    again, it's significant because those are senators who he

8    believed would be sympathetic to his actions.  He says, "I

9    think they would want me to be here" as he's doing it.

10           THE COURT:  But how is that consistent with

11   searching for things that he could use against the senators

12   who --

13           MR. JUMAN:  Those aren't the scumbags, to use the

14   defendant's word.  He's identified a group of the enemy.

15   They're the scumbags who stole the election.  And he thinks

16   that Senator Cruz is on his side.

17           But it's still a pitched battle between in his

18   mind two different groups, and it's still -- again, my point

19   is it's not an open-minded inquiry into the status of the

20   election.  It's a decision, effectively, that there's a war

21   on, and he's on one side.

22           The bottom line is --

23           THE COURT:  Not to beat a dead horse, but the

24   implication is that Senator Cruz may have possessed

25   something that proved that the election was stolen that he

```
 1    could then use --
 2              MR. JUMAN:  He was --
 3              THE COURT:  Let me finish.
 4              MR. JUMAN:  Sorry.
 5              THE COURT:  That he could then use against folks
 6    who didn't feel that way?  Is that the idea?
 7              MR. JUMAN:  I think that's the implication, yes.
 8              THE COURT:  Okay.
 9              MR. JUMAN:  But the point of that is he didn't
10    storm the Capitol because he had seen the evidence.  He did
11    it because he wanted so badly for those lies to be true, and
12    he was hoping that he'd find something in there.
13              Mr. Moynihan's sentencing memo spends a great deal
14    of time blaming the former president, and there's no doubt
15    about his role in all of this.  But the former president's
16    guilt does not absolve Mr. Moynihan of his own
17    responsibility.  Lots of people believed Trump's lies about
18    the election.  They didn't all storm the Capitol.
19              Mr. Moynihan was 30 years old on January 6th.
20    not a child.  And what his sentencing memo overlooks is
21    that he chose to believe the lies, not because of
22    evidence, but because they aligned with his political
23    views.  And believing lies without evidence is a choice.
24    Acting on those lies is a choice.  And those are choices
25    that Mr. Moynihan can't blame on the former president.
```

1     That's his responsibility.

2          And I'd like to respond to a few other points

3     raised in the sentencing memo from Mr. Moynihan.

4          First, he emphasizes the fact that he did not

5     engage in violence, and that's completely true.  But that

6     fact is already reflected in the charges he's faced and in

7     the sentencing range.  If he had assaulted anyone, certainly

8     he'd be facing a much higher sentencing range.  So just as

9     he can't be punished for things he did not do, neither

10    should he be rewarded for crimes that he didn't commit.

11         And the sentencing memo also seeks a major

12    reduction in the criminal history category, so I'd like to

13    address that.

14              THE COURT:  Please do.

15              MR. JUMAN:  Your Honor has undoubtedly had cases

16    where the defendant had no convictions, not even an arrest,

17    and Your Honor has considered that, at least in part, as a

18    mitigating factor.  I noticed Your Honor had sentenced an

19    individual named Blair recently, and you made a comment to

20    the effect that he had no criminal history, and even though

21    that was taken into account in his criminal history

22    category, it was still to some degree a mitigating factor.

23         Well, this case presents the opposite extreme.

24    It's a defendant who is not a first offender and has

25    demonstrated that short prison sentences do not have much

1      deterrent effect.

2              But Mr. Moynihan is asking the Court to ignore

3      that distinction.  He's asking the Court to treat him

4      effectively as if he was in Criminal History Category 2,

5      which, as we noted, is effectively noting five of his six

6      convictions.

7              THE COURT:  Let's just cut to the chase.  I mean,

8      you've accepted the Cat 5 designation, and I must say he

9      doesn't look like the average Category 5 defendant to me,

10     and I doubt he looks like the average Category 5 defendant

11     to the government; so, you know -- I mean, they're all

12     misdemeanors.  The two larceny misdemeanors are for stealing

13     a $90 set of headphones and some drill bits from Kmart and

14     Home Depot.

15             You know, while I don't know all the facts, the

16     timing and nature of the offenses would all suggest that

17     they relate somehow to, you know, some substance abuse

18     issues.  And while the judges in those cases did see fit to

19     sentence him to jail, the timing suggests that that was a

20     sanction for not complying with the lower sentences that the

21     whole series may have started with.

22             And so I guess the question is, if he's not a 5,

23     and he's not a 2, where does he fall?  Like how should the

24     Court consider his criminal history?

25             MR. JUMAN:  Your Honor, I'm reluctant to pick a

1    number --

2              THE COURT:  I know.  I know.

3              MR. JUMAN:  -- for obvious reasons, but I just

4    want to give a couple of other points to guide your

5    consideration.

6              THE COURT:  Okay.

7              MR. JUMAN:  One is some of the timing is a little

8    bit illusory.  The convictions took place over the course of

9    two days in May of 2018, the last four.

10             THE COURT:  The four drug convictions.

11             MR. JUMAN:  But the offenses occurred over a

12   period of ten months, if you look at the actual arrest

13   dates.  So it's not like he had a bender and then suddenly

14   all these things came down on him.  It's just that's when

15   those cases got resolved.

16             And I do think it matters.  You know, if this was

17   a drug case, if Mr. Moynihan committed a crime to feed a

18   drug habit, I think he'd have a much more compelling case.

19             There really is no connection here.  In other

20   words, drugs don't make you storm the Capitol.  This is --

21   the risk, whatever risk there is of future criminal conduct,

22   this kind of behavior really is completely independent of

23   any drug problem that he might have.  It's much more related

24   to his respect for the law, and we think that that creates a

25   significant risk.  Whether you believe it's Category 5 risk

1  or Category 4 risk or something, I guess, again, I think the

2  analysis is different because this isn't a drug case and

3  because there isn't that connection.

4     And I do think that --

5     THE COURT:  Not to put words in Mr. Smock's mouth,

6  but to play devil's advocate, isn't the counter argument

7  that if there's no indication that his behavior on January

8  6th was motivated by drugs, then those prior convictions are

9  even less relevant to his future dangerousness?

10     MR. JUMAN:  They may be less relevant in that

11  sense except that the fact they exist and the fact that

12  Mr. Moynihan knew they existed and he still decided to

13  engage in what he must have known was criminal conduct,

14  again, suggests a lack of respect.  It suggests that that

15  isn't something he has yet absorbed.

16     But I think it is important to assess this risk,

17  and I do want to focus on that in the context of the issue

18  of remorse.  Because I really do think that the Court has

19  undoubtedly seen enough of these cases.

20     Here's one where there's no indication of actual

21  remorse, no indication that he understands that on January

22  6th he did exactly what he accused others of doing.  He's

23  shouting "treason" in that clip as he marches through the

24  halls of the Capitol, but he's the one betraying the country

25  by trying to interfere with an election.

1          There's no indication that he understands those

2    rioters who he calling "patriots" are doing the least

3    patriotic thing that can be imagined, directly attacking the

4    government.  And if he doesn't understand those things, what

5    happens if he doesn't like how the next election turns out?

6          As I mentioned, Your Honor sentenced Mr. Blair,

7    David Blair, recently, and it involved a different charge

8    and a defendant who didn't go inside the Capitol, but I

9    raise that because in that sentencing the parties emphasized

10   two things:  Mr. Blair's remorse and his cooperation with

11   law enforcement.  And I mention that because neither of

12   those factors is present here.

13         Now, again, I have no doubt Mr. Moynihan regrets

14   going to the Capitol on January 6th.  But regret is not the

15   same as remorse.  Regret over the consequences you face is

16   not the same as understanding why what you did was wrong.

17         And if you look at Mr. Moynihan's conduct, which

18   we suggest is a far better way of determining whether or not

19   he feels remorse as opposed to anything he might say at the

20   last minute now that he's facing sentencing, you know, at

21   the time of his arrest, which is several months after

22   January 6th, he lies.  He tells the officers that he doesn't

23   have his cell phone, the same cell phone that he used to

24   record those videos I just played and some of the others I

25   offered as exhibits.

1          So the government had to go through the time and

2     trouble to get a search warrant for the phone signal to show

3     that, yes, he still had the phone, and then get another

4     search warrant to seize the phone.  And we didn't seek an

5     enhancement --

6          THE COURT:  So I was a little confused.  Those

7     were the arresting officers, not a subsequent FBI interview.

8     Correct?

9          MR. JUMAN:  The same agents, the case agents, who

10    went to arrest him.

11         THE COURT:  So these were FBI agents?

12         MR. JUMAN:  Yes, sorry, FBI, yes.

13         We're not seeking an enhancement for obstructive

14    conduct, but we do think those actions show a lack of

15    remorse, and I think it's important to note that unlike many

16    other of the January 6th defendants, Mr. Moynihan hasn't

17    offered to come in and speak candidly with law enforcement,

18    and he didn't plead guilty promptly.

19         And to be clear, it has nothing to do with the

20    change in counsel.  Mr. Smock has come in -- came in a year

21    after the arrest, so it really -- that's not the reason for

22    this.

23         Mr. Moynihan was under no obligation, obviously,

24    to talk to law enforcement.  He was not under any obligation

25    to plead guilty early.  We're not suggesting that he be

1    punished for exercising his rights.  But he stands before

2    the Court asking for a massive downward departure, and we

3    think it's fair to compare him to those defendants who did,

4    unlike Mr. Moynihan, demonstrate extraordinary acceptance of

5    responsibility, turning themselves into law enforcement,

6    offering to debrief, pleading guilty almost immediately

7    after.  And that's not this case.

8             And so the last thing I want to emphasize, Your

9    Honor, is just while the focus is obviously appropriately on

10   Mr. Moynihan today, this case is bigger than just him.  The

11   January 6th cases present a particular need for general

12   deterrence.

13            I'll quote Representative Kinzinger:  The forces

14   Donald Trump ignited that day have not gone away.  The

15   militant, intolerant ideologies, the militias, and

16   alienation and the disaffection, the weird fantasies and

17   disinformation, they're all still out there ready to go.

18            This is not an abstract concern.  The man for who

19   Mr. Moynihan stormed the Capitol is still out there telling

20   the same lies, and there are still people willing to believe

21   these lies.  People who don't care that the Court's rejected

22   the claims of fraud over and over again; people who think,

23   like Mr. Moynihan, that calling themselves patriots gives

24   them the right to break the law.  Those people are not going

25   to be persuaded by logic or by clever speeches.

1        But they are watching the sentences that are being

2    imposed in these January 6th cases, and that's why we're

3    asking for a sentence in this case that reflects the unique

4    threat posed by January 6th, that recognizes that threat has

5    not disappeared, and makes clear that attacking democracy is

6    going to be met with serious punishment.

7        We're asking for a sentence that takes into

8    account not just Mr. Moynihan, but also the victims; the

9    legislators and their staff, the police who risked their

10   lives to defend the Capitol, and the millions of Americans

11   who watched the events of January 6th horrified not only by

12   what the rioters accomplished but by what would have

13   happened if Mr. Moynihan and the other rioters had gotten

14   what they wanted.

15       And for that reason, Your Honor, we ask for a mid-

16   range-of-the-guidelines sentence.

17       THE COURT:  Which would be...?

18       MR. JUMAN:  37 months in Category 5.

19       THE COURT:  Okay.  Mr. Smock?

20       MR. SMOCK:  Thank you, Your Honor.

21       I want to start by saying a couple of things.

22   One is, number one, nothing that I say here today or said

23   in my sentencing memorandum was aimed at minimizing the

24   seriousness of what happened on January 6th or what

25   Mr. Moynihan did.  I think what I am suggesting is that a

1    sentence of a year in prison is appropriate, and it's hard

2    to minimize the significance of a year in prison when you're

3    talking about a person like Mr. Moynihan.

4           So I'm not suggesting that he's not guilty.  I'm

5    not suggesting that he shouldn't be punished.  Our

6    suggestion is that the punishment should be proportional to

7    his conduct, and that's what we're getting to in our

8    arguments.

9           THE COURT:  Well, why don't you address

10   Mr. Juman's last point, then, which is the sort of general

11   deterrence.  Folks may still be out there ready to answer

12   the next call, and regardless of Mr. Moynihan's personal

13   circumstances, a message needs to be sent to them as to what

14   their future actions might bring.

15          MR. SMOCK:  I actually don't disagree with the

16   point that general deterrence is a significant factor for

17   this Court to consider.  My argument --

18          THE COURT:  So then is a year in jail -- would

19   that generally deter someone who might be intent to reach

20   the very floor of the Capitol and rifle through a senator's

21   personal effects and disrupt the peaceful transfer of power

22   and put the lives of countless people at risk?

23          MR. SMOCK:  Absolutely.

24          THE COURT:  A year would be enough, if they get

25   caught?

1          MR. SMOCK:  With respect to folks who would be

2     considering it, the fact that they would be prosecuted --

3     arrested, prosecuted, and sent to prison is a significant

4     deterrent, particularly in light of the fact that, you know,

5     very few people have served -- who were involved in this

6     have served a sentence of that length.

7          So I think -- I mean, I've now represented a

8     number --

9          THE COURT:  I think most people who have pled or

10    otherwise been convicted of the felony count have served

11    that much, right?  I think sentences below a year for the

12    obstruction count are the exception rather than the rule.

13         MR. SMOCK:  So I may not have been clear.  I'm

14    saying folks had not been sentenced to time in prison prior

15    to involvement.  So for people who had not been sentenced to

16    as long as a year in prison, the idea of being arrested,

17    charged, sent to prison, is a significant deterrent.

18         THE COURT:  I see.

19         MR. SMOCK:  Second, with respect to the

20    government's argument that we're seeking a massive variance

21    or departure, I just want to be clear about what we're

22    asking for.

23         You know, it is definitely true, and I don't

24    shrink from the fact that we're suggesting that a

25    significant downward departure on his criminal history

1    should be -- should be put into place, and that's -- and

2    I'll get into that in a moment, but that's not -- that's

3    certainly grounded in fact.

4         And were the Court not to apply that plus-three

5    enhancement, our year-and-a-day recommendation would be

6    within the range.  Given that the Court has indicated that

7    you're intending to apply that plus-three 2J1.2(b)(2)

8    enhancement, I think the range would be 18 to 24, assuming

9    he's treated as a Category 2.

10        Our argument remains, even if the Court believes

11   that that plus-three should be applied under 3553(a), a year

12   and a day is the appropriate sentence, and it's reasonable

13   and sufficient in this case.  And I'll get into the reasons

14   for that.

15        THE COURT:  Talk about the criminal history.

16        MR. SMOCK:  Sure.  So I think the Court has

17   gathered the main part of our argument, which is that these

18   convictions are directly related to a lengthy problem with

19   opiate addiction, and it's a problem that he has addressed

20   while he's been on pretrial release.

21        I think the question --

22        THE COURT:  How should I -- how do I know that?

23   He spent six months in a residential placement facility.

24        MR. SMOCK:  Well, so that's a significant step for

25   a person with an addiction issue, that you have a report

1    from Pretrial Services that he has been doing very well in

2    treatment, and certainly the Court has been around long

3    enough to know that people have relapses, but it's a very

4    significant step to do that treatment and complete it

5    successfully.  And his family reports that he's doing well

6    now.

7              THE COURT:  And why did he do that then, you know,

8    eight months before sentencing?

9              MR. SMOCK:  He did it because he was hospitalized

10   after having an overdose and realized how serious this

11   problem was for him.  That's the reason.

12             And I think it bodes well for him that he's

13   actually doing well in treatment, going to outpatient

14   treatment multiple times per week without complaint,

15   evidencing an interest in completing it.

16             So when the government talks about the -- I think

17   the Court got to one of my arguments, which is if you look

18   at the language of 4A1.3(b)(1), which talks about departing

19   downwards if the criminal history overrepresents, two

20   things.  One is if it substantially overrepresents the

21   seriousness of the defendant's criminal history or the

22   likelihood that the defendant will commit other crimes.  So

23   here we have both of those things.

24             Number one, I talked about the fact that

25   Mr. Moynihan received relatively lengthy sentences for what

1    I personally believe would not be the type of offenses that

2    you'd see people going to prison for that length of time

3    normally.  All of them are misdemeanors.  Four of them are

4    possessions --

5            THE COURT:  Isn't it reasonable to infer that the

6    length of the sentences were ratcheted up because he

7    couldn't stay out of trouble?  They occurred during such a

8    short period of time that the judges in those cases

9    concluded that he needed an additional sanction in order

10   to --

11           MR. SMOCK:  And perhaps it's a difference of

12   philosophy, Your Honor.

13           THE COURT:  Yeah.

14           MR. SMOCK:  My view is if a person continues using

15   drugs and is arrested because they're found in possession of

16   those drugs, the answer is not more and more jail.  The

17   answer is treatment.  And he's shown that he can succeed in

18   treatment while he's been out in this case.

19           And so our argument is that the fact that a judge

20   in New York gave him repeated sentences of over 60 days and,

21   in fact, as much as nine months, I believe, does not

22   accurately reflect the nature of his criminal history.  I

23   mean, if you think about it, this Court has seen and I've

24   represented, in fact, people -- many people -- in Criminal

25   History Category 5.  And folks who legitimately fit in

1    Criminal History Category 5 can have as many as four

2    multiyear prison sentences.

3           Say you get a seven-year prison sentence, as the

4    Court is well aware, the max that you can get for that is

5    three points.  So if you have four of those, four times

6    three is 12, that puts you in the same criminal history

7    category as Mr. Moynihan is being treated as here.  So in

8    essence he's being treated the same as a person who had

9    committed four separate bank robberies over a period of time

10   and fits into Criminal History Category 5.

11          That's the reason why I don't think by any means

12   it's a stretch to treat him as a Criminal History Category 2

13   here.  The fact that these offenses were so minor and so

14   directly related to his addiction, which he has since

15   addressed, shows that it directly overly represents his --

16   the seriousness of his criminal history.

17          And then we get to the point that the Court

18   raised --

19          THE COURT:  I don't disagree with you that he's

20   not a 5, all right.  But address Mr. Juman's point that

21   here's a guy who has gone to jail four or five times, maybe

22   six times -- I don't know if each one of those was an

23   incarceration offense -- but yet still puts himself in

24   criminal jeopardy by doing what he did on January 6th.  So

25   clearly it has not -- prior jail has not specifically

1    deterred him from future criminality.

2         MR. SMOCK:  So I think that goes to the second

3    point under 4A1.3(b)(1), which is the question of whether

4    the criminal history accurately reflects the likelihood that

5    the defendant will commit other crimes.  And there I think

6    the point is what we have in this case is, you know, bad

7    conduct, illegal conduct, criminal conduct with respect to

8    what happened at the Capitol, and then the conduct which

9    gets him in Criminal History Category 5 technically which is

10   entirely different in nature.

11        And we're not suggesting that his drug use played

12   any role in what happened on January 6th.  They're entirely

13   different things.  And he has also, by the way, again, since

14   addressed the problems that led to all of those convictions.

15        So those prior convictions have no relevance to a

16   question of whether he would again get involved in some

17   event like January 6th.  They might speak to a question of

18   whether he would relapse and be convicted of possession of a

19   controlled substance again, but that, I don't think, is the

20   relevant inquiry in sentencing here today, and it certainly

21   isn't relevant in light of the fact that, again, he's gotten

22   treatment and has been very successful in treatment.

23        So another way -- I think the Court asks sort of

24   how would you get to an appropriate criminal history

25   category.  One way to think about it, if you're doing it by

1    the numbers, is, for example, if he had received a sentence

2    of less than 60 days for each of those prior petty larceny

3    convictions, each of them would count as one point.  And

4    let's say he got another sentence for one of the possessions

5    or was diverted and sent into treatment and didn't have

6    subsequent sentences for these possessions, which, again,

7    relate to use, he would have three criminal history points

8    for that and would be in Criminal History Category 2.

9         If at some point a judge was fed up and if this

10    Court believes it would have been reasonable to sentence him

11    to prison for more than 60 days based on a possession of a

12    controlled substance when he was addicted to opiates,

13    perhaps he would get a total of four criminal history

14    points.

15         But I don't -- I certainly stand before the

16    Court -- I don't think I have previously recommended a

17    departure of three levels, but I don't flinch from it at all

18    here.  I think this is actually an entirely reasonable

19    request, and I think this Court should consider him in a

20    Criminal History Category 2 given all those factors.

21         THE COURT:  There were some sort of conflicting

22    signals in the materials as to his home situation and his

23    relationship with his parents and other family members and

24    how much family support he would have if he were released to

25    the community.  Where would he live after serving his

1    sentence?

2          MR. SMOCK:  He can live with his parents.  He

3    currently does live with his parents, and they're happy to

4    have him back.

5          His goal is to get his own place again, and one of

6    the things that he's interested in doing is getting more

7    training in coding, computer coding.  He has a history

8    working at IBM.

9          And so he's not aspiring to live with his parents

10   for much more time, but he can return to living with them.

11   They're fully supportive of him, and that's where he can go.

12         I'm happy to address any other questions, but I

13   also wanted to move on to the 3553(a) factors whenever

14   you're ready.

15         THE COURT:  Go ahead.

16         MR. SMOCK:  So with respect to Mr. Moynihan's

17   history and characteristics, just -- I talked about them in

18   some detail in the sentencing memorandum, but he's 32 years

19   old.  He has done a lot of hard work to get himself in a

20   better position in life.  And he has struggled; there's no

21   doubt.  He tried to enlist in the military two separate

22   times, has sort of been frustrated in those efforts;

23   obviously has struggled with addiction to opiates.

24         But he has a history of work, and he's a person

25   who really enjoys cooking and has worked in kitchens

1       throughout his life and currently has a job as a cook.  He

2       cooks at home for his grandmother and has helped to take

3       care of her.

4              So he has had his struggles, but he also has had

5       real successes, and that's reflected in what's happened in

6       the past number of months in treatment, his work, and his

7       relationship with his grandmother.

8              So he's a person who has really actually done

9       quite well since this sort of frightening incident that

10      occurred several months ago, and the fact that Pretrial

11      Services vouches for that in their report to the Court and

12      provides the Court with evidence of his completion of the

13      program and a letter from his outpatient treatment provider

14      saying he's doing well, I think, is something that this

15      Court should take into account.

16             So Mr. Juman obviously, and for good reason, spent

17      a fair amount of time talking about the nature of the

18      offense, and I want to talk about that a little bit as well.

19             You know, Mr. Moynihan spent a fair amount of time

20      during the Trump presidency online reading what I think many

21      of the folks who were there on January 6th were reading,

22      watching, you know, news programs, listening to the

23      president of the United States talk about what was going on

24      in the world, and there was a -- sort of a crassness, a sort

25      of disrespect for, you know, normal ways of handling things

1      that sort of became pervasive during this time.

2              Nothing that I'm saying here is suggesting that he

3      didn't commit a crime, that he doesn't acknowledge that he

4      committed a crime; but I think we can't sort of lose track

5      of the fact -- and this is something that I sometimes do

6      myself -- of the fact that the president of the United

7      States was saying this election was stolen.  This wasn't

8      just some, you know, crackpot on the street with no

9      authority saying that there had been rampant fraud in the

10     election.

11             And, again, Mr. Moynihan had a responsibility not

12     to break the law in response to that, and that's why we're

13     talking about him going to prison for a year.  But it can't

14     be ignored that the leader of our country was saying this

15     was a fraudulent election.  Patriots have to stand up.

16     Patriots have to act.  And not only him, but, you know, the

17     news programs, everything that he was reading online was

18     saying that this was a fraudulent election and people had to

19     act.

20             Again, it doesn't absolve him of responsibility.

21     He has accepted responsibility.  But it has to be taken into

22     account in determining what a reasonable sentence is.

23             You know, another thing that I would mention --

24     and the government played audio recordings of Mr. Moynihan

25     speaking, and one of the things that he's talked to me about

1    is the fact that when he was in treatment he sought out

2    anger management treatment, and I think I provided, with my

3    sentencing memorandum, a certificate from the fact that he

4    completed an anger management course while he was in

5    treatment.  He's trying to address some of the causes of

6    what happened.

7         So the other thing that I think I want to make

8    clear is that -- well, I actually want to address another

9    question that you raised with Mr. Juman, which there was

10   some -- you know, obviously there's a point during which

11   Mr. Moynihan is looking at papers on a desk, and the Court,

12   I think, was seeking some logic to what was being said and

13   whose desk it was.

14        I can't answer the Court's question on that front.

15   I don't think there really was any particular logic to it.

16   I don't know that there's any evidence that he was aware of

17   whose desk he was at, what was being said.  This was --

18   things were being rifled through in a matter of seconds.

19        So there wasn't a sophisticated plan to find a

20   particular desk or some particular information.  It was

21   prompted by statements being made in the media by the

22   president that there was something afoot, and he believed

23   that he needed to try to find it.  And that was a big

24   mistake, and he shouldn't have done it, and that's why he's

25   going to prison.

1          What I want to emphasize about that is there are

2     people who come before this Court in this district who

3     actually stole papers, who, you know, altered papers, who

4     damaged property, who came in front of law enforcement

5     officers and insulted them, who assaulted officers and

6     injured them.  Mr. Moynihan is none of those people.  He did

7     not -- there's not a single video of Mr. Moynihan saying a

8     bad word, a disrespectful word to a member of law

9     enforcement, coming into contact with law enforcement.  He

10    put the papers back that he was looking at.  So this is an

11    entirely different case than cases in which people did any

12    of those things, and that, I think, the Court should take

13    into account.

14          Another point that the government raised about

15    Mr. Moynihan not voluntarily speaking to law enforcement, I

16    think the way these January 6th cases have been handled,

17    particularly with people who have entered plea agreements,

18    in my experience, is actually quite unusual.  Many of those

19    plea agreements -- in fact, almost every one that I've

20    seen -- includes a provision saying the defendant agrees to

21    meet with law enforcement to describe their conduct and

22    provide information.  That's unique in my experience in any

23    case unless it's a case in which a person is seeking 5K

24    cooperation credits.

25          So, of course, Mr. Moynihan has absolutely no

1    obligation to volunteer to go in to speak to law

2    enforcement.  If he had done that, I would be before you

3    seeking a 5K reduction for provision of information aiding

4    in the prosecution of others.

5         But that's not a basis to punish him more harshly.

6    That his counsel advised him you should not go in and speak

7    to law enforcement when you have a pending criminal case is

8    not a basis to give him more time.

9         THE COURT:  What if you tell law enforcement that

10   you lost your phone and they force him to get a search

11   warrant and they find your phone?

12        MR. SMOCK:  I'm glad you brought that up, Your

13   Honor, because I watched that video just this morning.

14        During that interaction with law enforcement, they

15   ask him for his phone, and he says -- where is his phone,

16   and he says, "I don't have it.  I can't afford it."

17        They then say, "Well, it must be somewhere.  Where

18   is it?"  You know, "Where is it?"  And they press him about

19   that, and he says, "I'd like to speak to a lawyer before I

20   answer that question."

21        So within a matter of a minute, he's not saying

22   it's gone.  He's saying I'd like to talk to a lawyer instead

23   of telling you where it is right now.

24        Another point that I think is important about that

25   is in many of these January 6th --

1          THE COURT:  Can we just put a pin on that real

2     quick.

3          MR. SMOCK:  Sure.

4          THE COURT:  I did not review the video.  I'm going

5     by the government's description in its materials.

6          Mr. Juman, if you could turn on that microphone,

7     does the government contest Mr. Smock's description of the

8     interview?

9          MR. JUMAN:  Your Honor, to be clear, that's not

10    one of the exhibits.  That's a recording of his post arrest

11    statement which we didn't offer as an exhibit.

12         THE COURT:  Okay.

13         MR. JUMAN:  But yes, basically they -- although I

14    do think they had already discussed it with him at the time

15    of the arrest, in the recorded statement he says that he

16    can't afford it, and then he asks to -- he doesn't want to

17    say any more; he wants to talk to a lawyer.

18         THE COURT:  So the statement "I can't afford it"

19    infers to you he's saying "I don't have a phone" --

20         MR. JUMAN:  I got rid of it because I couldn't

21    make the payments, yeah.

22         THE COURT:  But then he invokes.

23         MR. SMOCK:  Correct.  And I can tell the Court

24    that the way that it's said, the clear implications -- and I

25    think the officers gathered it -- he's not going to tell

1    them where it is until he speaks to a lawyer.  It wasn't an

2    ongoing assertion that you might as well not look for it

3    because I've destroyed it.  It was I'd like to speak to a

4    lawyer before I tell you more about that.

5            And that gets to the other point, which is, they

6    got the phone.  Right?  And there's no evidence that he

7    destroyed anything on the phone.  He certainly didn't

8    destroy the phone itself, but there's plenty of January 6th

9    cases in which there's evidence, and, in fact, some of the

10   comparator cases I cited, people had destroyed evidence on

11   their phone.  They had deleted things off of their phone in

12   an effort to hinder the investigation, and Mr. Moynihan did

13   not do that.

14           So that's sort of, under 3553(a), getting to what

15   is a reasonable sentence in terms of comparators, I think,

16   given that Mr. Moynihan did not harm law enforcement,

17   mistreat law enforcement, engage in violence, didn't destroy

18   property.  The thing that distinguishes him from the many

19   people who have gotten misdemeanor offers is the fact that

20   he went into the Senate Chamber.  And I'm not disputing that

21   that's not a relevant fact and that's why he has a felony

22   conviction here, but I think then you look at what happened

23   in sentencings of people who committed -- who engaged in

24   similar conduct -- and that's why I provided the exemplars

25   that I did, and I think the most obvious and clear

1     comparison is to Paul Hodgkins.  I included in my sentencing

2     memorandum a photograph of Mr. Hodgkins standing directly in

3     front of Mr. Moynihan at the dais.  Mr. Hodgkins, unlike

4     Mr. Moynihan, brought his goggles.  He brought a rope.  He

5     brought latex gloves to the Capitol.  Mr. Moynihan had

6     nothing like that.

7          The government, of course, in that case properly

8     asked:  Why is someone bringing rope?  Why is someone

9     bringing gloves to the Capitol?  And it certainly would be a

10    reason to believe that something sinister is afoot, that

11    they have more in mind than simply going into the building.

12    Mr. Moynihan had nothing like that.

13         The two of them were convicted of the same thing,

14    and Mr. Hodgkins got eight months incarceration.

15         Our view is that Mr. Moynihan's conduct was less

16    serious than Mr. Hodgkins's.  I guess what the government

17    would say is that Mr. Hodgkins didn't touch paper, but

18    Mr. Hodgkins took photographs in the chamber.  It's true

19    that Mr. Hodgkins's criminal history is less serious, but

20    we're suggesting a sentence that's four months longer than

21    what Mr. Hodgkins got, so I think that certainly takes into

22    account the difference in criminal history.

23         Tommy Allan was another comparator I provided,

24    and that's a person whose conduct was far more serious than

25    Mr. Moynihan's.  He didn't just stand at the dais like

1    Mr. Moynihan did.  He climbed up a rope to get into the

2    Capitol.  He went into the parliamentarian's office.  He

3    confronted Capitol Police officers, and here I think it's

4    especially relevant, he stole paperwork from two different

5    locations in the Senate Chamber and waved them around like a

6    trophy to a crowd.  He received 21 months.

7                I think Mr. Moynihan's conduct was far less

8    serious than Mr. Allan's, and his sentence should be far

9    less than Mr. Allan's.

10                The Court read my other --

11                THE COURT:  Who was Mr. Allan before?

12                MR. JUMAN:  That was Judge Friedrich, Your Honor.

13    That was my case.

14                THE COURT:  Got it.

15                MR. SMOCK:  So I think when you take all of those

16    things into consideration, the nature of his criminal

17    history, his relative culpability and the lack of violence,

18    the lack of destructiveness, a sentence of a year in prison

19    is certainly sufficient and not greater than necessary in

20    this case.

21                THE COURT:  Okay.  Thank you.

22                All right.  Mr. Moynihan, anything you want to

23    tell me?  Come up.

24                MR. SMOCK:  Your Honor, in light of the fact that

25    this is a stipulated facts trial, I've advised him that it

```
 1        would not be in his interest to talk today.
 2                    THE COURT:  All right.
 3                    MR. JUMAN:  Your Honor, if I could just quickly
 4        clarify something?
 5                    THE COURT:  Sure.
 6                    MR. JUMAN:  Just because Your Honor had expressed
 7        an interest.
 8                    I just wanted to note on Page 18 of our sentencing
 9        memo we relay the text of what Mr. Moynihan says as he's
10        going through the papers.  At the bottom of 18 is:  This is
11        Cruz's shit.  This is a good one.  Him, Lawler or whatever,
12        Hawley, Cruz.
13                    Then another rioter says:  I think Cruz would want
14        us to do this.
15                    And Mr. Moynihan responds:  Yeah, absolutely.
16                    That's on Page 18.
17                    THE COURT:  Very well.
18                    All right.  Mr. Moynihan, I know that you've been
19        listening.  I know that you participated in these
20        proceedings.  Although the actions of everyone on January
21        6th caused a lot of damage, not only to the Capitol and to
22        the law enforcement officers and staffers who were there
23        that day and even broader damage to our democracy in a
24        number of senses, these are very much individual
25        proceedings.  And, you know, we talk about January 6th a
```

1    lot, but I want to assure you that I've tried to fashion a

2    sentence that fits for you based on all of the circumstances

3    that we've been discussing.

4            Starting with the Sentencing Guidelines, which is

5    where I have to start -- we talk a lot about numbers, but

6    folks just aren't numbers on a page.  Right?  You know, I

7    have to decide whether that 33 to 41 range that you fall in

8    is appropriate or, you know, if it adequately reflects the

9    seriousness of your criminal history.

10           If you had no criminal history, your range would

11   have been 15 to 21 months, which is about half, so it makes

12   a big difference what your criminal history is.

13           And I agree with Mr. Smock that it does -- that

14   range -- overstate your criminal history.  All of your prior

15   convictions are misdemeanors.  The two larceny offenses are

16   petty, both in name and in substance.  The four drug

17   offenses are all simple possession as opposed to

18   distribution, and they occurred during a fairly limited

19   period in 2017, four years before the events of January 6th,

20   or three-plus years before, when you were apparently in the

21   throes of a pretty serious opioid addiction.

22           Your history isn't good.  All right?  And the

23   judges in those cases saw fit to sentence you to jail time;

24   but your profile, as I've said, is a lot different from

25   other defendants who typically show up in front of me with

 1    that sort of criminal history score.

 2           Now, I'm not sure I can get all the way down to

 3    Category 2, but I do think that some departure or variance

 4    based on the calculated range is warranted.

 5           The question then becomes whether a further

 6    variance is warranted based on your other conduct and the

 7    other factors that the Court has to consider, and there are

 8    factors weighing on both sides of that equation.  Right?

 9           In terms of your participation, you were a very

10    active participant.  You knew exactly what you were doing.

11    As Mr. Juman said, you spent time outside of the Capitol.

12    You had to have known what was going on before you made a

13    conscious decision to go in.

14           You were one of the first people in.  Not the

15    first, but you were fairly early, and you didn't just walk

16    in, as some people did, but you pushed your way in.  You

17    stayed inside for a half hour.  You left only after being

18    told to do so by the police, and most importantly, you

19    intentionally entered the most hallowed hall and inner

20    sanctum of the Congress, which is the Senate Gallery and

21    Chamber, and remained there for 20 minutes.

22           And as we've talked about, you rifled through the

23    personal papers of at least one senator, and then bragged

24    about it.  And when you were caught, whether it rises to the

25    level of an outright lie or not, but you weren't forthcoming

1    with the FBI when they showed up at your house.  And, as I

2    said, you more generally contributed to the overall chaos

3    and damage that January 6th caused to the Capitol and our

4    nation generally.

5            And as I tell all defendants, you're extremely

6    lucky that the day did not end up more dangerous and more

7    deadly than it did, and that's because of the restraint that

8    was shown by a lot of Capitol Police officers and

9    Metropolitan Police officers who were outnumbered,

10   obviously, but their actions made sure that it didn't turn

11   out a lot worse than it did.  Okay?

12           On the positive side, in terms of your

13   involvement, as Mr. Smock has indicated, you were not

14   physically violent.  You weren't a leader or organizer, as

15   far as I know, in the sense of those words, and there's no

16   evidence obviously that you brought any weapons to the

17   Capitol or assaulted any law enforcement officers.

18           In terms of your background, you know, you have

19   been dealt a few bad cards in your life, but on the other

20   hand you seem to have had a fairly normal upbringing.

21   You've had at least some education.  You've held down jobs.

22   But I think it's clear that you have substance abuse issues.

23   I applaud you for trying to deal with those, but I doubt if

24   you've completely dealt with them, and that's something that

25   you will have to deal with going forward.  And I don't think

1    that they explain your actions on January 6th.

2             In terms of disparities, you know, when two

3    different defendants come before me or anyone else in this

4    court, it's important that people are sentenced roughly

5    equally for -- based on their conduct and all of the other

6    factors, so we spend a lot of time comparing your case to

7    other cases.  It's very difficult to do, particularly when

8    cases are before other judges because there are many, many

9    factors that often don't get reflected in the record that go

10   into what an appropriate sentence is for a particular judge.

11            I compare folks to my own cases.  You both cited,

12   I believe, the *Michetti* case where I think the government

13   says I sentenced him to 18 months.  It was actually only

14   nine, but there were some extenuating factors in that case.

15   He had no criminal record.  He was supporting a family and a

16   young daughter.  He was very gainfully employed.  He did not

17   enter the Senate floor, and he had been on home detention

18   pending sentencing for about 18 months.  So there were some

19   substantially differing facts in that case --

20            MR. JUMAN:  I apologize.  We'll correct our

21   records internally.

22            THE COURT:  No worries.  And so I felt that a

23   nine-month sentence on the lead obstruction charge was

24   appropriate in that case.

25            But I think this case is a more serious one than

1    that one.

2            So balancing all those factors, I do think that a

3    sentence of incarceration is necessary to reflect the

4    consequences and seriousness of your actions.

5            So with that, Mr. Michetti, if you could stand,

6    please.

7            MR. SMOCK:  Mr. Moynihan.

8            THE COURT:  I'm sorry, Mr. Moynihan.  I get them

9    confused.  Why don't you come up to the podium.

10            All right.  Pursuant to the Sentencing Reform Act

11    of 1984 and in consideration of the provisions of 18 USC

12    3553 as well as the advisory Sentencing Guidelines, it is

13    the judgment of the Court that you, Christopher Patrick

14    Moynihan, are hereby committed to the custody of the Bureau

15    of Prisons for a term of 21 months -- and that is the low

16    end of Level 3 of the guidelines -- on Count 1, a term of 12

17    months on each of Counts 2 and 3, and six months on each of

18    Counts 4, 5, and 6 -- was there a Count 6 or just a --

19            MR. SMOCK:  Yes, I believe so.

20            THE COURT:   -- with all terms to run concurrently.

21    You are further sentenced to serve a 36-month term of

22    supervised -- a term of supervision as to each of Counts 1

23    and a term of 12 months on each of Counts 2 and 3 with all

24    such terms to run concurrently.

25            I did not mention this, but one of the data points

1    that I don't have here is your remorse because you have

2    chosen not to address the Court.  I had some questions for

3    you about your motivations, about whether those motivations

4    remain today.  36 months of supervised release is on the

5    longer side for January 6th defendants, but I think that is

6    appropriate here because I have no idea whether you would

7    answer the next call.  What you think about the events that

8    led to your participation with two years of retrospect, you

9    know, I can't tell, so I think you particularly need to be

10   under the supervision of the criminal justice system for a

11   little longer than some other January 6th defendants might

12   because I can't make that bet on you right now.  Okay?

13        In addition, you are ordered to pay a special

14   assessment of $100 on each of Count 1, $25 for each of

15   Counts 2 and 3, and $10 for each of Counts 4, 5, and 6 for a

16   total of $180 in accordance with 18 USC 3013.

17        While you are incarcerated, I will recommend your

18   participation in a drug treatment and education program as

19   well as the Resolve program, which is designed to address

20   mental-health-related needs related to trauma and anger

21   management and things like that.

22        While on supervision, you shall abide by the

23   following mandatory conditions as well as all the

24   discretionary conditions recommended by the probation

25   officer in Part D, "Sentencing Options of the Presentence

1    Report," which are imposed to establish the basic

2    expectations for your conduct while on supervision.  The

3    mandatory conditions include:

4        You must not commit another federal, state, or

5    local crime.  You must not unlawfully possess a controlled

6    substance.  You must refrain from any unlawful use of a

7    controlled substance.  You must submit to one drug test

8    within 15 days of placement on supervision and at least two

9    periodic drug tests thereafter as determined by the Court.

10   You must cooperate in the collection of DNA as directed by

11   your probation officer, and you must make restitution in

12   accordance with 18 USC 3663 and 3663A and any other statute

13   authorizing a sentence of restitution.

14       You shall comply with the following special

15   conditions under supervision.

16       First, substance abuse treatment.  You must

17   participate in an inpatient or outpatient substance abuse

18   treatment program and follow the rules and regulations of

19   that program.  The probation officer will supervise your

20   participation.

21       Substance abuse testing.  You must submit to

22   substance abuse testing to determine if you have used a

23   prohibited substance.  You must not attempt to obstruct or

24   tamper with the testing methods.

25       Third, mental health treatment.  You must

1    participate in a mental health treatment program and follow

2    the rules and regulations of that program.  The program

3    officer, in consultation with the treatment provider, will

4    supervise your participation in the program.

5            Fourth, financial information disclosure.  You

6    must provide the probation officer access to any requested

7    financial information and authorize the release of any

8    financial information.  The probation office may share

9    financial information with the U.S. Attorney's Office.

10           And fifth, financial restrictions.  You must not

11   incur any new credit charges or open additional lines of

12   credit without the approval of the probation officer.

13           The Court finds that you do not have the ability

14   to pay a fine and therefore waives imposition of a fine in

15   this case.

16           As to restitution, under both the Victim and

17   Witness Restitution Act of 1982 and the Mandatory Victims

18   Restitution Act, the Court finds that the defendant's

19   actions, as part of the breach of the Capitol, contributed

20   to over $2.8 million in damage to the building as estimated

21   by the government, and consistent with past cases, the Court

22   will apportion $2,000 of that damage to the defendant's

23   action and order restitution in that amount.  Restitution

24   payments shall be paid to the Architect of the Capitol.

25           The Court determines that you do not have the

1    ability to pay interest, and therefore waives any interest

2    or penalties that may accrue on that balance.  Restitution

3    payments shall be made to the Clerk of the Court for the

4    United States District Court for disbursement to the

5    Architect of the Capitol.  The address will be in the order.

6    You must pay the balance of any restitution owed at a rate

7    of no less than $100 each month.

8            The financial obligations, other than the

9    restitution, are immediately payable to the clerk.  Within

10   30 days of any change of address, you shall notify the clerk

11   of the change until such time as the financial obligations

12   are paid in full.

13           The probation office shall release the presentence

14   report to all appropriate agencies, including the probation

15   office in the approved district of residence, in order to

16   execute the sentence of the Court.  Treatment agencies shall

17   return the presentence report to the probation office upon

18   the defendant's completion or termination from treatment.

19           You can appeal your conviction to the D.C. Circuit

20   if you believe that your guilty plea was somehow unlawful or

21   involuntary or if there is some other fundamental defect in

22   the proceeding that was not waived by you in your guilty

23   plea.  There was no guilty plea in this case, so that

24   applies to the counts that were not subject to the bench

25   trial.

1           MR. JUMAN:  I just wanted to be clear.  There was

2     a guilty plea to some of the counts, but not the others.

3           THE COURT:  So obviously you have preserved your

4     appellate rights with respect to the count of conviction

5     that was tried before the Court.

6           All right.  You also have a statutory right to

7     appeal your sentence under certain circumstances, including

8     if you think the sentence was imposed in violation of law or

9     was imposed as a result of an incorrect application of the

10    Sentencing Guidelines or is more severe than the maximum

11    established by the guidelines range.  You may also appeal

12    your sentence again on the other counts if you believe you

13    received ineffective assistance of counseling at sentencing.

14          You have the right to challenge the conviction

15    entered or sentence imposed to the extent permitted by 28

16    USC 2255.  Any notice of appeal must be filed within 14 days

17    after entry of judgment or within 14 days after the filing

18    of a notice of appeal by the government.  If you are unable

19    to afford the cost of an appeal, you may request permission

20    from the Court to file an appeal without cost to you.  On

21    appeal, you may also apply for court-appointed counsel.

22          Any other objections, Counsel?

23          MR. JUMAN:  No, Your Honor.

24          THE COURT:  Mr. Smock?

25          MR. SMOCK:  Your Honor, I don't know that this

1    would ever be relevant, and I don't know if it's important

2    for you to address this.  I think you said something about

3    having waived the right to appeal something about his

4    sentence.  There was not a plea agreement in this case, so I

5    don't believe that there's a waiver with respect to the

6    appeal of the sentence.

7             THE COURT:  Okay.

8             MR. SMOCK:  Just to the extent that that needs to

9    be on the record.

10            THE COURT:  That is probably correct.  This one

11   was a little -- sort of a curve ball.

12            MR. SMOCK:  Yeah.

13            THE COURT:  Any placement recommendation?

14            MR. SMOCK:  We'd ask to make a recommendation to a

15   facility as close as possible to Poughkeepsie, New York.

16            THE COURT:  All right.  Very well.

17            And no dismissal of any other charges because he

18   pled to the indictment and was subject to a bench trial.

19            All right.  Mr. Moynihan, you know, I know you

20   didn't talk to me today.  I don't know you.  I haven't

21   really gotten a real feel for you personally, which puts me

22   at somewhat of a disadvantage, but, you know, I say this to

23   many of my defendants:  You should not be judged by the

24   worst mistake that you made, and I think this was a pretty

25   big mistake.  I hope you share that.  Okay?  And if you

```
 1    don't, and you continue along this path, and you continue to
 2    believe stuff that will get you back in trouble for doing
 3    stuff like this, then, you know, you're on notice.  Okay?
 4              All right.  Good luck to you.
 5              MR. SMOCK:  Thank you.
 6              THE PROBATION OFFICER:  I'm sorry, Your Honor, Ami
 7    Landon for U.S. Probation.  Was voluntary surrender
 8    mentioned, or is it --
 9              THE COURT:  You're not moving to step him back,
10    are you?
11              MR. JUMAN:  Your Honor --
12              THE COURT:  Or are you?
13              MR. JUMAN:  Ordinarily we would not.  I do want to
14    draw the Court's attention to the incident described in
15    Paragraph 64 of the PSR.  I don't want to get into any more
16    detail, but Mr. Smock alluded to it, the overdose.
17              In light of that, I would simply say in this case
18    I think we'll defer to the Court on this, but I don't think
19    we are as comfortable as we might be in a different case.
20    So we'd just like to ask the Court to consider that in
21    making its decision.
22              THE COURT:  That had not occurred to me.
23              Mr. Smock.
24              MR. SMOCK:  Your Honor, the government refers to
25    an incident that I talked about as well that occurred a
```

 1    number of months ago, and what the Court has at Document

 2    No. 54 is a report from Pretrial Services on Mr. Moynihan's

 3    compliance, and there's an indication that he successfully

 4    completed a program since that time.  He's in group three

 5    times a week now in outpatient treatment and doing well.

 6             There's also a certificate from Samaritan Village.

 7    There's a letter from his outpatient treatment provider

 8    confirming that he's in ongoing outpatient treatment.

 9             To the extent there's any basis, the question

10    under 3143 is whether he's likely to flee or pose a danger

11    to the safety of any other person or the community.  There

12    is no basis to make that finding.

13             I think the government, perhaps, who is suggesting

14    a concern about Mr. Moynihan's safety, I guess could make

15    some further argument about safety to the community related

16    to that.

17             But, again, he's in treatment.  He completed

18    inpatient treatment and is in the hands of very competent

19    providers who see him three times per week.

20             THE COURT:  He's living at home?

21             MR. SMOCK:  He is, yes.

22             THE COURT:  Neither of the parents are here, I

23    take it.

24             MR. SMOCK:  His father drove him here but is not

25    in the courtroom.

1          MR. MOYNIHAN:  I'm right here.

2          MR. SMOCK:  Oh, sorry.

3          THE COURT:  Sir, if you could come up.  I read

4     your letter.  I appreciate it.

5          MR. MOYNIHAN:  I apologize for my attire, Your

6     Honor.  I spilled some coffee on my shirt.  I normally would

7     not appear before a Court dressed like this.

8          THE COURT:  You're quite all right.  And remind me

9     what you do.  You're a -- what do you do for a living?

10         MR. MOYNIHAN:  I'm a retired corrections sergeant.

11         THE COURT:  That's right; you're a correctional

12    officer.

13         MR. MOYNIHAN:  Yes.

14         THE COURT:  So you have some not only background

15    with respect to your son, but also the situations that we're

16    discussing here.

17         MR. MOYNIHAN:  Yes, Your Honor.

18         THE COURT:  Is he going to be all right?

19         MR. MOYNIHAN:  Excuse me?

20         THE COURT:  Is he going to be okay?

21         MR. MOYNIHAN:  I think he will be under our

22    supervision.  I think he would be without our supervision

23    honestly.  He's -- this was a very stressful event, the

24    prospect of, you know, federal prison and so forth, and I

25    think that played a role in his relapsing.

```
 1              But he's come to terms with all those things, and
 2     we've had lengthy discussions about his future and what
 3     could have happened and the impact it had on our family,
 4     especially his -- my wife, his mother, and his grandmother,
 5     as well as his sisters.  So I think he understands the
 6     impulsivity of what he did and that that's not him; that
 7     he -- I think he's come to terms with amending his life.
 8              THE COURT:  So I think you will probably agree
 9     with me that that's going to be a process.  Right?
10              MR. MOYNIHAN:  Yes.
11              THE COURT:  And given his background and these
12     proceedings and everything that's happened -- you know, I
13     don't know where you were a correctional officer, but in the
14     federal system BOP has a number of programs that can be very
15     helpful with both substance abuse issues and mental health
16     issues, and he can come out the other side of this in a
17     better place than he went in.
18              And so I hope you encourage him that, you know,
19     there is -- there could be some upside to this process and
20     that he needs to get through it and come out a better
21     person.  All right?
22              MR. MOYNIHAN:  Yes, Your Honor.  And I think it
23     also --
24              THE COURT:  And to make sure he shows up wherever
25     he's designated.
```

1        MR. MOYNIHAN:  Absolutely.  And for whatever it's

2    worth, he has been active in helping other people in their

3    addictions, and there were family members who -- one was

4    suicidal, and he spoke to them at great length about, you

5    know -- about his addiction and the 12-step program and so

6    on and so forth.  And as it turned out, the man committed

7    suicide anyway, but my son did his utmost, so -- you know,

8    to avoid that from happening.  So he will try to help other

9    people.

10        And obviously you haven't had a chance to talk to

11    him so it's difficult to have a feel for the person in front

12    of you, but he's not a monster.  Okay?  He's not.  He has

13    come to terms with what happened, and he's somebody who

14    wants to help other people.

15        Before he got his current job, he was looking at a

16    job for working with the retarded.  And there was problems

17    going through the background investigation with his driver's

18    license and whatnot.  And while he was working that through,

19    this other job came along, and he needed -- he felt a need

20    to establish to you that he was actively seeking a job.  He

21    didn't want to come here with excuses about why he wasn't

22    employed.

23        So I hope that gives a better picture of the man.

24        THE COURT:  It does.  Just make sure he gets where

25    he needs to be --

```
1                  MR. MOYNIHAN:  I will, Your Honor.

2                  THE COURT:  -- and in a good frame of mind.

3                  Okay.  So the Court will allow self-reporting, and

4       you'll hear from BOP as to when and where he needs to

5       report.

6                  THE PROBATION OFFICER:  Your Honor, apologies,

7       probation one more time.  It wasn't included in our

8       recommendation.  Is the Court opposed or are the parties

9       opposed to the transfer of supervision to the Southern

10      District of New York, where Mr. Moynihan resides?

11                 THE COURT:  That's fine.  We can transfer

12      supervision, but not jurisdiction.

13                 THE PROBATION OFFICER:  Okay.  Thank you.

14                 MR. SMOCK:  Thank you.

15                 THE COURT:  All right.  We're adjourned.

16                         (Whereupon the hearing was

17                          concluded at 3:22 p.m.)

18

19

20

21

22

23

24

25
```

1      <u>**CERTIFICATE OF OFFICIAL COURT REPORTER**</u>

2

3              I, LISA A. MOREIRA, RDR, CRR, do hereby

4      certify that the above and foregoing constitutes a true and

5      accurate transcript of my stenographic notes and is a full,

6      true and complete transcript of the proceedings to the best

7      of my ability.

8          Dated this 7th day of April, 2023.

9

10                                  <u>/s/Lisa A. Moreira, RDR, CRR</u>
                                     Official Court Reporter
11                                   United States Courthouse
                                     Room 6718
12                                   333 Constitution Avenue, NW
13                                   Washington, DC 20001

14

15

16

17

18

19

20

21

22

23

24

25